[Crim. No. 3297. First Dist., Div. Two. Feb. 18, 1957.]

THE PEOPLE, Respondent, v. WARREN WILLIAMS, Appellant.

Warren E. Williams, in pro. per., for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, and John S. McInerny, Deputy Attorney General, for Respondent.

COMSTOCK, J. pro tem.*—Appellant and Lester Robinson were accused by information filed in the Superior Court for the City and County of San Francisco of unlawful possession of heroin, a narcotic, in violation of section 11500, Health and Safety Code. An amended information added a charge against appellant of a previous conviction of felony. Both defendants pleaded not guilty to the main charge and appellant denied the alleged previous conviction. A motion by each defendant for a separate trial was denied. The case was tried before a jury on May 1 and 2, 1956, against appellant alone. The record is silent as to why the defendants were not tried together. The jury returned a verdict finding appellant guilty as charged; the allegation of the prior conviction was found to be true. Judgment was duly pronounced and appellant was sentenced to be imprisoned in the state prison for the term prescribed by law. His appeal is from the judgment.

The record shows that on February 6, 1956, at about 8:30 p. m., Officer Ted Lescher of the San Francisco Police Department observed Warren Williams commit a traffic violation by unlawfully backing his automobile through the intersection of Scott and Ellis Streets in San Francisco. The officer stopped Williams and wrote out a citation. Williams told the officer his address was in the 1500 block on Filbert Street, which was a different address from that shown on his .operator's license. Lescher asked Williams the name of the nearest cross street to his home and received an answer that it was 16th Street. Lescher said 16th Street did not cross Filbert and Williams replied that he lived in Oakland, not San Francisco. Asked what his occupation was and why he was in San Francisco, he informed Lescher that he was unemployed and that he had come to San Francisco that evening to keep an appointment with a girl. The officer noticed that Williams appeared ill, nervous and fidgety and very drawn. Another traffic violator diverted the officer's attention; he went to issue a citation to the other and while so engaged noticed Williams drive up to the curb on Ellis Street and admit Lester Robinson to his car and drive away. About five, minutes later, Lescher saw Williams, with Robinson in

*Assigned by Chairman of Judicial Council.

his car, driving west on Geary Street, at Scott. He was suspicious and followed them to the corner of Post and Divisadero Streets, where Williams drove into a somewhat crowded Standard service station and pulled alongside the rest rooms. Lescher stopped across Divisadero Street and was there joined by Officer Fletcher. Together they observed Robinson get out of the passenger side of the front seat of Williams' car, which was near the rest room door, and enter the rest room. Williams remained in the automobile behind the wheel. Both officers crossed the street and Lescher approached Williams to further interview him while Fletcher walked up to Robinson who was then coming out of the rest room. Officer Lescher again asked Williams about his address and this time received an answer that he lived in the 2500 block in Oakland. Lescher then proceeded to search Williams. The officer described the search as, "Just a quick search or 'frisk,' for a weapon," and "Just a hand search, outside of his clothing." No weapon was found. A sum of money was found in Williams' shirt pocket. During this search of Williams, Robinson stood near the left front fender of the car. Neither Williams nor Robinson was then arrested. The station was well lighted. Lescher thoroughly examined the cement pavement and the area all around the car, using a flashlight as well as the lights from the station. Nothing was found except a small, valueless piece of paper. He stepped to the right front door of the car and attempted to open it. His testimony on this was: "Q. (Berman) And did you open it? A. I attempted to open it, but it was stuck. Q. And what happened then? A. Mr. Williams entered the automobile from the left front door, leaned across the front seat and opened the right front door. Q. When the right front door was open, did you observe anything in the automobile? A. I did. Q. What did you observe? A. I observed a hypodermic needle lying on the floor of the passenger side of the front seat. Q. I will show you here People's Exhibit number 1. The Court: Is that marked 1 for identification? Mr. Berman: Yes, Exhibit 1 for identification. Q. And ask you if that is the hypodermic needle you found at that time? A. This is. I marked it at the time. Q. After you found it, what did you do with the needle? A. I had Mr. Williams and Mr. Robinson come around to the right side of the automobile. Mr. Williams came through the right front door and I handcuffed them together. Q. And they were placed under arrest, is that right? A. They were. Q. Did you observe anything

on the ground at that time? A. No. Q. Did you ever, at any time, observe anything on the ground? A. I did. Q. When was that? A. After I had handcuffed both men singly behind their backs, I observed a bindle of white powder and an eyedropper approximately one foot from the left foot of Mr. Williams. Q. From the left foot of Mr. Williams? A. That's correct. Q. And where was Mr. Robinson in relationship to Mr. Williams? A. On Mr. Williams' right. Q. On Mr. Williams' right? A. Yes. Q. I will show you here People's Exhibit number 2, eyedropper, and ask if that is the eyedropper you saw at that time? A. That is it. I marked that also. Q. And I will show you here People's Exhibit number 3, which appears to be a white piece of paper, containing a white powder. A. That I found also. I have initialed it also—"W" for Williams. Q. You put the "W-TL" on here, is that correct? A. That's correct. Q. And you say People's number 3 for identification, and People's number 2—the eyedropper, and the one bindle, were found one foot away from the left foot of Mr. Williams? A. That's correct. Q. And Mr. Robinson was on his right? A. That's correct. Q. Did you find anything else or—I will withdraw that. Did you observe any other narcotic, or any other articles that purported to be narcotics at that time? A. I did. Q. And when and where was that? A. I observed Mr. Robinson moving around, and at that time, approximately four feet from Mr. Williams, I observed a packet of white papers falling from what appeared to be the left pants-leg of Mr. Robinson. Q. And that was about four feet away from Mr. Williams? A. Approximately. Q. Was that before or after you found People's Exhibit number 2 and number 3? A. After. Q. Afterwards? A. Yes, sir. Q. I will show you here People's exhibit number 4, and ask you if those are the packs of white papers to which you refer? A. These are. I marked each one separately. Q. And those are all with your initials "TL"? A. That's correct. Q. Now, how long was it after you observed the condition of ground—the condition of the cement surface of the service station, and found nothing there except the white piece of paper you described, that contained nothing,—how long after that was it that you found People's Exhibits number 2 and 3 next to the left leg of Mr. Williams? A. Not over three minutes. Q. Now, was the defendant placed under arrest? A. That's correct." Williams' testimony as to this episode was: "Q. (Postel) What did Officer Lescher do? A. Then Officer Lescher proceeded to search

various places, and he went around my car and tried to get into the car from the passenger side, the front door. Q. Was he able to get in? A. No. Q. So, what did you do? A. Well, I reached over and to assist him. I put the handle down, to let him in the car. Q. After the door was opened, what did the officer do? A. Well, he proceeded to shine his flashlight around the car, and he said underneath there, I don't know, he said he found a hypodermic needle. Q. Did he place you under arrest at that time? A. Yes, he did. He ordered me out of the car, and he handcuffed me behind my back. Q. Was Robinson there then? A. No. Q. When did Robinson return. A. Well, I'd say about three minutes after he had handcuffed me behind my back. Q. When Robinson came back, what was done? A. When Robinson came back, he asked Robinson did he know me. Robinson said yes, what is the trouble? And he said, well you are under arrest, and then he placed Robinson under arrest. And he took the handcuffs from the other officer and handcuffed Robinson. Q. Now, at that time, did you drop anything on to the ground? A. No, I did not. Q. On any of these times, did you have any narcotics in your possession? A. I have not. I have never used any narcotics. I have never sold or had anything, any dealings with narcotics. Q. I will show you People's number 3, and ask you if you have ever seen that before? A. No, I haven't. Q. Did the officer show you anything similar to this at that time? A. Yes, he did. He showed me something similar, but I don't know whether that is it, or not. Q. Showing you People's number 4, a group of packets, did you see these at that time? A. Well, yes, I did. Q. Had you ever seen them before the officer showed them to you? A. No, I had not. Q. Showing you People's number 2, the eyedropper, had you ever seen that before? A. No, I haven't. Q. Did you have this with you on that day? A. No, I did not. Q. When did you first see this? A. When Officer Lescher said 'What is this?' and he reached under the front wheel of my car and pulled that out. Q. Showing you People's number 1, the needle, when did you first see that? A. After Officer Lescher ordered me out of the car, and told me I was under arrest, and I asked him why, and he said because you have a hypodermic needle. And I told him I didn't know where it came from. Q. Had you seen this lying in the car? A. No, I had not.'' Both Williams and Robinson were taken to the Park Police Station. Lescher observed and interviewed Williams there. Williams had numerous

new needle marks on his arm. The officer had become familiar in police work with narcotic withdrawal symptoms. Williams appeared to him to be suffering these symptoms. He was ill, cold, shivering, having chills; his stomach was bothering him; he was doubling up, bending over. Williams stated he had received a shot of heroin from Robinson gratis about the first of the year; that since then he had been making purchases from him; that he had been home on the night of his arrest and was ill from lack of narcotics; that he could not stand the pain and he came over to the City to make a purchase from Robinson.

Appellant states the grounds upon which he relies for reversal as follows:

"(1) Illegal, Search and Seizure;

"(2) Illegal Arrest;

"(3) That the weight of evidence does not warrant sustaining the judgment;

"(4) Failure to receive a fair and impartial trial;

"(5) Due Process of Law;

"(6) That the expert witness disqualified himself;

"(7) That the Jury was given information illegally which would tend to prejudice them;

"(8) Illegal Evidence, due to time and way admitted;

"(9) Improper instructions of Jury."

We have reached the conclusion that there is no merit in the appeal and that the judgment must be affirmed.

Appellant's main argument for reversal is that the evidence upon which he was convicted was erroneously admitted in that it was obtained by an unlawful search and seizure: that he was illegally arrested, and that the hypodermic needle, the eyedropper and the heroin were found without the authority of a search warrant and without being discovered or seized as an incident to a search connected with a lawful arrest. The offense was committed and the case was tried long after our Supreme Court decided *People* v. *Cahan,* 44 Cal.2d 434 [282 P.2d 905]. Defendant's counsel was familiar with this decision, as shown by his arguments on law points before the trial judge outside the presence of the jury. We think the case made against the defendant upon evidence that was received at the trial pursuant to his express stipulation or without objection by him fully supports the judgment.

At the outset of the trial, in the presence of the jury, counsel for the People exhibited the hypodermic needle, (People's Exhibit 1 for Identification) the eyedropper or

syringe, (People's Exhibit 2 for Identification) one bindle of heroin, (People's Exhibit 3 for Identification) and a packet of eight bindles of heroin, (People's Exhibit 4 for Identification) fully describing them, without objection by defendant. The People asked to call as their first witness, out of order, Herbert F. Bergman. Counsel for defendant said, "No objection." This witness described himself as a Narcotic Inspector, State Department of Justice. Defendant's attorney stipulated that Bergman was a qualified narcotic inspector, expert to analyze "the various articles, as to whether they are narcotics, or not." Bergman was shown the hypodermic needle and the eyedropper and described them as articles customarily used by narcotic addicts and the method of their use. He was shown the bindles of heroin and testified that he had examined and analyzed them all; that each bindle contained one and one-half grains of heroin. Without making any objection or motion to strike, the attorney for defendant cross-examined this witness as to these exhibits, and on such cross-examination Bergman testified to the method of using the needle and dropper, but that he "did not analyze the needle or the syringe, just the bindles."

Officer Lescher was questioned concerning his searching Williams' person at the service station when he first interrogated Williams there. A timely objection was made on defendant's behalf and the court ordered the objection argued out of the presence of the jury. Counsel for the People made it clear there was no arrest at that time and that it would not be claimed there were any narcotics found on defendant's person at that search. Defendant's attorney persisted in the objection and the objection was sustained by the court. Immediately upon the court being reconvened, Lescher was asked, without objection, "You testified that you searched the defendant?" and answered, "I did." The details of that search were not then gone into. He then testified as to the inspection of the ground, the attempt to open the door of the car, Williams' opening it for him, the finding of the hypodermic needle, the arrest, the finding of the eyedropper and the heroin, the identification and description of the various paraphernalia and the narcotics, the examination and interrogating of defendant at Park Station, the observation of the needle marks on defendant's arm, defendant's admission of being a narcotic user, of having previously purchased heroin from Robinson and of having come to San

Francisco on this occasion to meet and purchase heroin from Robinson. All this went into evidence without objection by defendant. The first objection to any evidence following the objection which was sustained by the court as to the initial search of Williams' person came when, at the conclusion of Officer Lescher's direct examination, the needle, syringe, bindle of heroin and packet of eight bindles, which had previously been marked People's Exhibits one through four for Identification, were physically offered in evidence, whereupon the attorney for defendant objected on the grounds that "they were recovered in illegal arrest and illegal search." This objection was overruled. Thereafter, without further objection or motion to strike, Lescher was fully cross-examined and Williams took the stand and testified in detail as to his version of the finding of the needle, the arrest and subsequent events, the main part of his testimony relating to the finding of the needle, the arrest and the connected events being as quoted above.

We hold that defendant waived objection and may not now on appeal claim error as to the admitting of evidence concerning which no objection or motion to strike was made, and that the record so made fully justifies the conviction and sustains the judgment. In *People* v. *Kitchens,* 46 Cal.2d 260, at 262 [294 P.2d 17], the court said, ". . . we adhere to the rule that ordinarily the admissibility of evidence will not be reviewed on appeal in the absence of a proper objection in the trial court," but then went on to apply the now familiar exception that said rule would not be applied to cases tried before the Cahan decision in which illegally obtained evidence was admitted under the former nonexclusionary rule. The case at bar was tried after the Cahan decision and the general rule applies that failure to object waives the objection. In *People* v. *Kelsey,* 140 Cal.App.2d 722, at 723 [295 P.2d 462], the court said, "At the time of trial defendant's attorney was familiar with the decision of the Supreme Court in the case of *People* v. *Cahan,* 44 Cal.2d 434 [282 P.2d 905], and not only made no objection to the receipt of the evidence or motion to strike, but, in effect, waived any such objection. . . . (*People* v. *Kitchens,* 46 Cal.2d 260 [294 P.2d 17].)"

There was some advantage to be gained by defendant allowing the evidence to go in without objection. There was obviously available to him the argument that he was completely cooperative in assisting the officer to open the door and look

into the automobile, and that the needle then found, as well as the eyedropper and heroin subsequently found, belonged to Robinson and not to him and that his entire conduct in the premises was a badge of innocence. ▮ The principle of forbidding a party to change his position in these circumstances has long been applied. In *People* v. *Rolfe*, 61 Cal. 540, at 542, the court said, " 'The practice, whether in civil or criminal cases, of deliberately permitting evidence to be given without objection in the first instance, and then moving to strike it out on grounds which might readily have been availed of to exclude it when offered, is not to be tolerated.' A party is not permitted to remain silent when evidence is offered, with the privilege of accepting it if favorable and afterwards moving to strike it out if it is against him, but he must exercise his right of objection at a proper and reasonable time." (*People* v. *Caritativo*, 46 Cal.2d 68, at 73 [292 P.2d 513].) In the present instance defendant did not even move to strike the claimed objectionable testimony. On the contrary, he proceeded to bring out all the material facts concerning the finding of the articles when he took the stand in his own behalf, though obviously attempting to shift the blame to Robinson.

▮ In addition to having waived objection to the evidence, defendant appears to have consented to the officer's looking into the car and to have actively and voluntarily, without compulsion on the officer's part, opened the door to permit him to look inside. All the elements of legal consent were present. Moreover, the finding of the needle under all the circumstances constituted reasonable grounds for believing that defendant and his companion Robinson were jointly engaged in the common act of unlawful possession of a narcotic, and, therefore, justified the arrest and the incidents which followed. It was not unreasonable for the officer without any show of force or coercion, after having tried the door of the car, to accept defendant's implied invitation to look inside when defendant reached across from the driver's side and opened the door for the officer, as stated by defendant, "to assist him." The case falls within the principle of *People* v. *Burke*, 47 Cal.2d 45 [301 P.2d 241], wherein officers, having had prior information that narcotics were used on defendant's premises, the source of the information being undisclosed by the evidence, went to defendant's apartment at approximately 11 o'clock p.m. without warrant "to make a narcotic investigation." They knocked and defendant

came to the door and opened it a small distance and asked who was there. One of the officers replied, ''We are officers. We would like to talk to you.'' After a moment's hesitation, the defendant stepped back, opened the door and turned on the light. The officers walked into the room without express invitation and proceeded to question the defendant. It was held that an implied invitation to enter was plain. An officer asked defendant if he had ever been arrested for narcotics and defendant admitted that he had been some years before. He was further asked, ''Do you have any narcotics here at the present time?'' and answered, no. The officer then said, ''You don't mind then if we search your apartment do you?'' The defendant replied, ''No, go ahead.'' In the ensuing search of the apartment the officers found marijuana. Defendant admitted that it was his and that he had smoked some of it. At the trial the marijuana was admitted in evidence over defendant's objection that it was obtained in violation of the exclusionary rule of the Cahan case. The trial court held that there was no need for a search warrant and that defendant consented to the search. Our Supreme Court held in deciding the appeal that the defendant freely consented to the search of his apartment which disclosed the evidence. We think the arrest was amply justified when viewed in the light of the principles applied in *People* v. *Blodgett,* 46 Cal.2d 114 [293 P.2d 57] and *People* v. *Martin,* 46 Cal.2d 106 [293 P.2d 52]. In the Blodgett case, officers saw two people at an early hour of the morning enter the rear seat of a taxicab which had driven up and double parked outside a hotel. Two officers who had been observing the cab decided to investigate it. They approached and ordered the occupants to get out. One of the officers, without request or invitation, opened the left rear door and as he did so saw the defendant withdraw his left hand from behind the seat at the juncture of the seat and back cushion. After the defendant and his companion got out, the officer removed the rear seat and found three marijuana cigarettes where defendant had withdrawn his hand. Against the contention that the search of the cab was unlawful and that the evidence obtained thereby was therefore inadmissible, the court held that the search and discovery of the marijuana were justified upon the ground that there is nothing unreasonable in an officer's questioning persons outdoors at night; that in view of the hour and the unusual conduct of the occupants of the cab it was not unreasonable for the officers to order them to get out of the cab for question-

ing and that since an officer saw defendant's furtive action in getting out, he had reasonable grounds to believe that he was hiding contraband and the search of the cab was therefore reasonable. In *People* v. *Martin,* with no more original ground for suspicion than that they saw two men sitting in the front seat of a parked automobile at night in a location known as a "lover's lane" officers turned their patrol car around to investigate the car and its occupants, whereupon, the suspect's car took off at a high rate of speed. The officers pursued, with red light and siren on, stopped the car and approached it, one from the left and one from the right, one of them directing his flashlight into the car. Defendant was sitting on the right-hand side of the front seat. His left hand and his companion's right hand were on the center of the seat. The officers ordered them both to put their hands in front of them. When they did so, an officer saw a small bag in the middle of the front seat that had been covered by their hands. The officer ordered the suspects out of the car, searched them for weapons and then reached into the car and took the bag. One of them examined its contents and concluded that they were marijuana, which a later analysis confirmed. It was held that the entire conduct of the officers was justified and that the evidence procured in the search of the automobile without warrant was admissible. We think the facts of the instant case bring it well within the principles enunciated in those cases and the authorities therein cited. Moreover, the defendant having raised no objection to a full description by witnesses of the exhibits and conduct in connection therewith, no tenable claim of prejudice could arise from the articles themselves being admitted. (*People* v. *Citrino,* 46 Cal.2d 284, 288 [294 P.2d 32] ; *People* v. *Akers,* 143 Cal.App. 2d 224, 228-229 [299 P.2d 398].)

Defendant contends that it was error to permit the reading to the jury of the charge of a previous conviction of felony. When arraigned on the amended information in which this charge first appeared, defendant denied it. The procedure followed was in accordance with section 1093 of the Penal Code. It is only where the defendant has confessed the previous conviction that the clerk in reading the information must omit therefrom all that relates to such previous conviction. Here, the defendant did not admit the previous conviction until it came out in the evidence. Defendant is apparently confused in asserting that the clerk should not have read the entire amended information to the jury after

it had been impaneled and sworn. Up to that point he had not confessed, but had denied the prior conviction. This contention is devoid of merit.

Much of appellant's brief is devoted to patently fallacious argument such as that the narcotic expert disqualified himself by testifying that marijuana is a narcotic, which appellant bluntly states it is not; that the weight of the evidence tends to point more strongly to the guilt of Robinson than to that of plaintiff, and that Lescher should have been disbelieved because his actions smacked of "police state tactics" and he was apparently trying to make a "name" for himself. Such contentions, if proper at all, may only be addressed to the trier of fact, not to an appellate court which does not concern itself with conflicts of evidence or the credibility of witnesses.

Appellant entreated this court that, inasmuch as he is not trained in law nor a learned scholar, and must work under great handicaps with limited facilities, we should be most careful to examine the record and each point brought out by him. This we have done. We have read the entire record with great care and have given earnest consideration to every point advanced which we deemed of sufficient force to be worthy of discussion. Respondent urged that appellant's brief was fatally defective for failure to observe the provisions of rule 15(a) of the Rules on Appeal, and we agree that the brief did not comply with said rule and that in the absence of proper supporting references to the transcript or apt authorities we were not bound to search the record for error. However, the transcripts were not voluminous and such contentions as had a semblance of legal theory behind them were not difficult to follow. We therefore gave the case a complete consideration on its merits. For the reasons stated, we have concluded that the case was fairly tried, that no prejudicial error was committed and that the evidence supports the conviction.

The judgment is affirmed.

Dooling, Acting P. J., and Kaufman, J., concurred.