[Crim. No. 6458. Second Dist., Div. One. June 3, 1959.]

THE PEOPLE, Respondent, v. WILLIAM C. BLANKEN-
SHIP, Appellant.

William C. Blankenship, in pro. per., for Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Arthur C. DeGoede, Deputy Attorney General, for Respondent.

WHITE, P. J.—The district attorney of Los Angeles County filed an information wherein defendant was charged

in one count with the crime of forcible rape (Pen. Code, § 261, subd. 3), and in a second count with the offense of assault with a deadly weapon (Pen. Code, § 245). The information also charged prior convictions of the crime of attempted kidnapping and rape and kidnapping. Defendant pleaded not guilty and admitted both prior felony convictions. Trial was had before a jury which found defendant guilty as charged in both counts. His motion for a new trial was denied and he was sentenced to state prison. From the judgment of conviction and the order denying his motion for a new trial, defendant prosecutes this appeal.

As to the factual background surrounding this prosecution, we regard the following as a fair epitome of the evidence presented by the prosecution. On the morning of April 1, 1958, at 11 a.m., Mrs. Diane Williams, a housewife, was at home in her apartment with her two children of the ages of 4 months and 2½ years. Mrs. Williams' husband had departed earlier that morning for work. Answering a knock at her apartment door, Mrs. Williams was confronted by defendant who said that he represented an insurance company and inquired if she was Diane Williams. Upon receiving an affirmative answer defendant stated that a person of that name had been mentioned in a will and that his purpose was to ascertain whether she was the person therein named. Mrs. Williams testified: ". . . and I thought well, he knew my name so I'll let him in, and I opened the door and he sat in the chair next to the door, and I picked up the baby out of the bassinet and my other little girl and I walked over to the couch and sat down." For a period of about 45 minutes the defendant asked Mrs. Williams questions to which she gave answers which the defendant wrote down on lined paper in a black loose-leaf notebook. The defendant perspired during this period of conversation. He then asked Mrs. Williams to sign her name to a piece of paper so that her signature could be compared. She signed her name once or twice on some paper in the loose-leaf binder. The defendant then put his hand over her mouth and placed a knife at the right side of her throat and told her not to scream or make any kind of move or her baby, who was lying on the couch, would be killed. Mrs. Williams nodded her head and, when the defendant's hand was removed from her mouth, said she wouldn't scream and asked him what he was going to do. The defendant pulled the knife away from her throat a little bit and replied, "You know what I'm going

to do,'' and told her to put the older girl, who was standing next to Mrs. Williams, in the bathroom. After some discussion the older child was put in the kitchen and the baby in the bassinet. The defendant finally consented to Mrs. Williams placing a contraceptive diaphragm in her person so that ''I wouldn't become pregnant.'' The defendant followed her in her movements throughout the apartment, still holding the knife. He continually perspired and told her to hurry. They went into the front room and the defendant told her to lie on the floor. Mrs. Williams lay down, rigid and scared. He then unbuttoned her blouse and touched her breasts, raised her skirt, unzipped his pants, put the knife away and had sexual intercourse with Mrs. Williams. She allowed him this act of intercourse because she was in fear of her own life and safety and because she was in fear for the lives and safety of her children, one of whom the defendant had threatened to kill. The defendant tied Mrs. Williams' hands with twine and left the apartment. Within five minutes, and as she was untying her hands, a friend of the family, William Sweeney, knocked on the door. Mrs. Williams had gotten one hand loose and let him in. She screamed to him that she had just been attacked. Sweeney went out to look for the man but could not find him and then telephoned the police who arrived in about five or ten minutes. The police officers took Mrs. Williams to the Central Receiving Hospital at which place a vaginal smear was taken from her private parts. The smear contained spermatozoa.

A payroll card of the company for which the defendant worked was introduced in evidence. It indicates that the defendant was credited with eight hours of work on April 1, 1958, and that he had lost no time on that day. This card was prepared by the defendant. The defendant's supervisor, Harold Smith, indicated thereon that he approved the hours as recorded on the card.

In rebuttal, Harold Smith, testified that it was not common practice to mark on the time card when someone in management, such as the defendant, takes an hour or so off during the day.

Defendant did not testify in his own behalf but presented evidence of an alibi and also in contradiction of some of the testimony offered by the prosecution. This testimony will hereinafter be referred to as we discuss the issues presented on this appeal.

As grounds for a reversal of the judgment and order herein, appellant contends:

"1. The evidence is insufficient to support the judgment in that:

"(a) There is insufficient evidence to support a finding that Mrs. Williams resisted her assailant or that her resistance, if any, was overcome by force or violence, or that she was prevented from resisting by threats of great and immediate bodily harm accompanied by apparent power of execution.

"(b) There is insufficient evidence to support a finding that the defendant was the person who attacked Mrs. Williams.

"2. The defendant was deprived of due process of law in that:

"(a) The deputy district attorney was guilty of prejudicial misconduct in withholding evidence favorable to the defendant.

"(b) He was not taken before a magistrate within the time required by law.

"(c) Evidence which was illegally seized was admitted at the trial.

"(d) The trial court indicated its sympathies lay with the prosecution.

"3. The trial court committed prejudicial error in admitting evidence which imputed of another crime.

"4. The trial court erred in its instructions to the jury in that:

"(a) It failed to give the defendant's requested instruction on evidence susceptible of different constructions.

"(b) It failed to give the defendant's requested instruction on the effect of false testimony.

"5. The trial court erred in failing to comment on the evidence."

In his contention that the evidence is insufficient to sustain the judgment of conviction, appellant states that, "he is not prosecuting this appeal on the grounds that Mrs. Williams was not attacked. Whether Mrs. Williams was attacked or not is of no consequence to appellant. Appellant raises the points on her behavior in that they reflect on her credibility as a witness and should be scrutinized by the court. Mrs. Williams may very well have been attacked. If so, her behavior and the events, she relates, during that hour and one-half in her apartment makes an incredible story." In his

claim that the testimony of the victim as to her "behavior" not being that of a woman forced to comply with a demand for sexual intercourse but rather indicative of cooperation and willing participation in the act, appellant points to the fact that she used a contraceptive diaphragm and jelly, "felt no shame," and that her attacker did not have to force her legs apart to gain entry.

It is not contended by respondent that there was any active resistance to the act of sexual intercourse. The victim herself testified that she permitted the act to be committed because she was in fear of her own life and as well for the lives and safety of her two children. Subdivision 4, section 261 of the Penal Code is directly applicable to Count I of the information herein, which applies where the female is prevented from resisting "by threats of great and immediate bodily harm, accompanied by apparent power of execution." That the fears of the prosecutrix were reasonable is at once apparent when consideration is given to the testimony that her attacker had threatened to kill the youngest child while holding a knife at the mother's throat, unless she complied with his demands. And the knife was not put away until the act of intercourse was commenced. There was evidence that after holding the knife against the throat of his victim, appellant continued to keep the weapon out while following Mrs. Williams throughout the house. When the latter inquired of appellant as to what he was going to do, the latter replied, "You know what I'm going to do," at which time he continued to menace Mrs. Williams with the knife. Whether or not the evidence would have sustained a conviction under subdivision 3 of Penal Code section 261, we entertain no doubt that all of these circumstances and the acts and conduct of appellant constituted a very real threat to the complaining witness within the meaning of subdivision 4, and that they more than sufficiently explain the absence of active resistance on the part of the victim. It requires no strain on the imagination to appreciate the plight of the prosecutrix herein. What would have happened to her at the hands of appellant, if she had pursued a course different than she did, is problematical.

Furthermore, in all cases, of which the instant one is typical, since there is an abundance of evidence in the record tending to show that the prosecutrix was frightened and terrified, it is always with the jury to say, where there is some creditable evidence of the fact, whether the female was, at the time of

the assault, possessed of such fear as would likely have the effect of impairing, if not altogether destroying, her ability to so resist her assailant as to prevent actual intercourse.

 Appellant's next contention that no substantial evidence appears in the record to support the finding that he perpetrated the attack upon Mrs. Williams cannot be sustained. What appellant asks this court to do is to retry the cause, reweigh the evidence and hold that the testimony of the victim, William Sweeney and F. L. Thomas, is without evidentiary value. The evidence hereinabove recited amply answers appellant's objection and his argument that the testimony of the foregoing witnesses was untrustworthy and inconclusive in many respects. However, that was a matter for the jury to determine in the first instance (Code Civ. Proc., § 1847), and later for the trial court to consider in passing on the motion for a new trial (*People* v. *Green*, 13 Cal.2d 37, 42 [87 P.2d 821] ; *People* v. *Hightower*, 40 Cal.App. 2d 102, 106, 107 [104 P.2d 378]).

 A reviewing court may not reweigh the evidence, nor reverse a judgment of conviction for insufficiency of the evidence unless it is made clearly to appear that upon no hypothesis whatsoever is there sufficient substantial evidence to support the verdict (*People* v. *Newland*, 15 Cal.2d 678, 681 [104 P.2d 778] ; *People* v. *Jones*, 36 Cal.2d 373, 375 [224 P.2d 353] ; *People* v. *Gould*, 111 Cal.App.2d 1, 5 [243 P.2d 809] ).

 While it is true that an appellate tribunal will not sustain a judgment or verdict based upon evidence inherently improbable, that category does not embrace testimony which merely discloses unusual circumstances. As was said by our Supreme Court in *People* v. *Huston*, 21 Cal.2d 690, 693 [134 P.2d 758] : "To warrant the rejection of the statements given by a witness who has been believed by a trial court, there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions. (Citations.) Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. (*Hicks* v. *Ocean Shore R.R., Inc.*, 18 Cal.2d 773, 781 [117 P.2d 850].)" The identification testimony of the complaining witness cannot be strictured as being inherently improbable. About two weeks after the assault upon her, Mrs. Williams was shown about 20 photo-

graphs. She went through these photographs and when she came to a picture of the appellant, picked it out without hesitation as a picture of the man who had attacked her. She went to the police station on the evening of the same day and viewed the appellant through a "one-way" glass window. She identified him then and also recognized his voice in a conversation which she had with him at the police station. At the trial she unequivocally identified appellant as the person who attacked her. Mrs. Williams had ample opportunity to observe appellant in the approximate one hour during which he was at the apartment. For the first 45 minutes of this period she sat facing the defendant who was approximately 12 feet away.

Also, during the time Mrs. Williams was being interrogated by her assailant, he was writing down her answers on white lined paper in a black loose-leaf notebook. There were several pieces of pink paper in this notebook also. Approximately two weeks after the attack occurred, a loose-leaf binder (People's Exhibit 4) was found in the appellant's locker or in his mailbox at his place of employment. Mrs. Williams testified that it appeared similar or identical to the one that she saw in the hands of her attacker. This binder also contained pink paper and white lined paper therein, which, according to Mrs. Williams' testimony was similar to that contained in her assailant's notebook. Appellant discounts this evidence because Mrs. Williams, in her testimony, sometimes referred to her attacker's article as a brief case, whereas she testified that she would call People's Exhibit 4 a "looseleaf binder." However, Mrs. Williams, in her testimony, first referred to the article as a "black looseleaf binder."

A knife was found in appellant's locker at his place of employment and was introduced in evidence as Exhibit 3. Mrs. Williams testified that she recognized this knife as the one which her attacker had held at her throat and that she had never seen a knife of that shape before or since that time. The knife is commonly used in the factory where the defendant worked. A supervisor of that factory testified that he had never seen a similar knife anywhere other than in the factory.

Mrs. Williams' assailant tied her hands with some twine (People's Exhibit No. 1) after he had completed his act of intercourse. A ball of twine (People's Exhibit No. 14) was found in the glove compartment of the appellant's automobile on the day of his arrest. An expert witness testified that

People's Exhibit 1 and People's Exhibit 14 had the same color, four strands each, a similar number of fibres in the strands of each, and a similar origin. He further stated that in his opinion People's Exhibit 1 could have come from People's Exhibit 14. In tying Mrs. Williams' hands with the twine her assailant used "funny" knots which she had never seen before. An investigating officer found a pamphlet in the defendant's car which was entitled "How to Tie Knots."

The appellant's wife testified, as did her neighbor, Georgia Patton, that they saw no ball of twine in the glove compartment of the car which they used on the morning of the appellant's arrest. Since the latter had the opportunity to place People's Exhibit 14 in the car after this time and before he was arrested, such testimony did not in fact impeach Officer Thomas' testimony as to finding the ball of twine.

William Sweeney, a friend of Mr. and Mrs. Williams, stopped in his automobile in front of the apartment house in which Mrs. Williams lived at about 12 noon on April 1, 1958. A black 1947 or 1948 Plymouth sedan which contained one male person left a parking place into which Sweeney parked his car. The appellant's automobile is similar to the one which Mr. Sweeney saw pull away from the curb. Mrs. Williams' attacker left her apartment shortly before this car pulled away from the curb. This is reasonably inferable in that Sweeney, who left his car to go to the Williams' apartment, got there within five minutes of the defendant's leaving the apartment. At this time Mrs. Williams was still untying her hands, she having commenced this action upon the attacker's leaving the apartment. On finding out that Mr. Sweeney was at the door she stated that her attacker had just left. It can also be reasonably inferred from the testimony of a boy who lived in an apartment in the same building. This boy testified that he saw a man run from the apartment house and, a minute or two later, saw Sweeney in the hall of the apartment building. Appellant attempts to attack, on two counts, Sweeney's testimony that he saw a black 1947 or 1948 Plymouth sedan pull away from the building. Appellant contends that the neighbor boy saw no cars in front of the apartment building between 10 and 12 a.m. However, the boy merely testified that between 10 and 12 a.m. he had occasion to look out the front window toward Figueroa Street and did not recall seeing any cars immediately in front of the entrance to the apartment. Appellant also contends that the neighbor boy testified that the man who ran out of the building did not

enter a car. However, here again appellant misreads the record. The boy testified that he lost sight of the man who ran out of the building when the man "just reached the sidewalk." Thus it is apparent that by the boy's own testimony he could not tell whether the man who ran from the building entered a car which was parked at the curb of the street.

Mrs. Williams first testified that her assailant wore a light brown suit, while in the apartment, which was similar to a suit (Exhibit 6) which was taken from the appellant's home and was identical in pattern and color although she could not be positive that they were the same. Later she testified that she had made a mistake in her previous testimony and that her assailant had worn a medium to dark brown pair of gabardine slacks which did not match his coat. While the claimed variances or inconsistent statements, and the contradictions referred to undoubtedly afforded opportunity for an argument to the jury against the reliability of the testimony given by the witnesses, we see in them nothing from which a reviewing court could justly conclude that their entire testimony is *per se* unbelievable, and that it was, therefore, the jury's duty to wholly disregard it. Mrs. Williams also testified that the man who attacked her wore a plastic raincoat through which she could see "some." A raincoat taken from appellant's home and introduced into evidence, according to the testimony of Mrs. Williams, is identical to the one she saw on her attacker.

Appellant next attacks the sufficiency of the evidence on the ground that he established an alibi. The evidence which he presented on this issue consisted of the records of the company by which he was employed, indicating that he had been credited with eight hours of work on April 1, 1958, and that his supervisor had approved the record showing credit for this working day. However, it was shown that at about 8:30 a. m., on the day in question, appellant asked his supervisor if the former might not take some time off that day to attend to some business, and the supervisor gave his consent. Appellant urges that it would have been impossible for him to be absent from his work for over an hour and a half and not have his absence observed by his supervisor. But, as pointed out by respondent, "This argument is unsound for several reasons. First of all, the evidence indicates that he need only have been missing from work for about an hour or slightly more. He entered the apartment at about

11 a. m. and left about 12 noon. Inasmuch as his supervisor had given him permission to take some time off it is highly unlikely that he would be missed for such a short period of time. Furthermore, the record shows that on the morning of April 1, he had a change of duties—he was to take charge of a new production line in the next week and on April 1 was merely to observe the new line and learn anything that might help in his management. Thus it is apparent that he had no duties which required his presence at the plant other than mere observation of this production line." This conflicting testimony also merely presents a question of fact for determination by the jury who resolved it against appellant.

 ■ Appellant next urges that the deputy district attorney was guilty of prejudicial misconduct in withholding from the jury facts favorable to him. He asserts that the report of the doctor who took the vaginal smear of Mrs. Williams was withheld, but the record reflects that a certified copy thereof was offered and received in evidence as People's Exhibit 11. The record does not bear out appellant's contention that when the doctor commenced to read the report he was stopped by the prosecutor. ■ Appellant's claim that he was prejudiced when the deputy district attorney would not consent to allowing Dr. Hellman, attached to the Los Angeles Central Receiving Hospital to examine appellant's genitalia is not borne out by the record.

In this regard it appears that on the morning of the assault, Mrs. Williams was taken to the receiving hospital where Dr. Hellman took from her person a vaginal smear. The doctor was in court as a witness called by the prosecution. When Dr. Hellman was sworn to testify, appellant's counsel asked permission for himself and the deputy district attorney to approach the bench where the following proceedings were had outside the hearing of the jury:

"MR. BODLEY (Appellant's counsel): Sir, inasmuch as there is testimony as to the unusually small size of the attacker, I would like to ask that we enter into a stipulation that the defendant at this time be examined by the doctor from the County Hospital presently on the stand with reference to whether the size of his private parts is unusual small.

"THE COURT: Well, of course, that is a matter for counsel to determine, whether or not you are going to introduce evidence to that effect, and the method and manner of doing it. It is undoubtedly admissible.

"Mr. Esnard (Deputy District Attorney) : I would think so.

"Mr. Bodley : Would you see any objection to allowing this medical doctor to examine him?

"The Court : I wouldn't see any objection to allowing any medical doctor to examine him. That is a matter for you to determine.

"Mr. Bodley : The defendant is willing to submit himself to examination.

"Mr. Esnard : I would be glad to have him do that. I would not consent to letting this doctor do it. It would be perfectly agreeable with me for you to have it done.

"The Court : It is not a matter for the Court. I can't appoint a doctor for that purpose. You will have to make your own arrangements for his compensation, the doctor's compensation as a witness.

"Mr. Bodley : Yes, your Honor.

"The Court : I want it understood that I have no objection to it. As a matter of fact, I think it is perhaps the thing for you to do. If I were in your place I would want to do it.

"Mr. Bodley : Thank you.

"The Court : As far as you are concerned, Mr. Esnard, I don't see that you can object to any legally authorized medical doctor, but you don't want to enter into a stipulation for a particular doctor?

"Mr. Esnard : I would want to have somebody that I feel at least the Court has been familiar with and has been used by the courts.

"The Court : You don't know whether doctors have a standard of measure for a thing like that?

"Mr. Esnard : That may be.

"The Court : I think it is something for you to investigate as an attorney for the defense in this matter, Mr. Bodley, in determining what to present in your evidence on the defense.

"Mr. Bodley : Yes, your Honor.

"The Court : It certainly is agreeable, desirable, in view of her very positive statement.

"Mr. Bodley : Do you feel if I bring a competent medical man that there would be any objection because he is not a court-appointed doctor?

"The Court : Oh, of course not. It is a matter of his compensation that I am concerned with. I have no authority under the status of the case as it now stands to appoint the

doctor. That is a matter for the defense to defray themselves.

"MR. BODLEY: Yes, your Honor."

Since it appears that appellant abandoned the idea of using Dr. Hellman without making any request of him to make such an examination, and instead engaged Dr. George Agzarian to make such examination, the results of which were testified to by the latter, we perceive no prejudice to the substantial rights of appellant.

■ As a further ground for reversal, appellant contends that the prosecutor withheld evidence of a "Vehicle Impound Inventory," which he says is "the common practice of the Los Angeles Police Department to make out . . . on any impounded vehicle." A certified copy of this report is attached to appellant's opening brief. Officer Thomas testified that the appellant's automobile was impounded on April 16, 1958, whereas report shows the vehicle was impounded April 17, 1958 and that no property was removed from the automobile and held as evidence. It is appellant's contention that this report would have tended to impeach Officer Thomas because, "It would have clearly shown that Officer Thomas did not impound the defendant's automobile on April 16, 1958, as he testified, but on April 17, 1958 as is recorded on this report. It would have clearly shown that Officer Thomas did not find a ball of string in that automobile as he testified. As it is recorded on this report that no evidence was taken from this automobile. This constitutes reversable error in that the prosecuting attorney withheld evidence, favorable to the defendant, from the jury." This argument is unavailing because the report was not signed by Officer Thomas but by Officer Reid. Therefore, impeachment through inconsistent statements would not have been possible. Furthermore, appellant makes no showing that the deputy district attorney had any knowledge of the existence of this report. Surely the prosecutor could not be charged with misconduct for withholding evidence of which he knew nothing. ■ Only where the prosecution knowingly and deliberately suppresses evidence favorable to the accused is a deprivation of due process and denial of a fair trial established (*Pyle* v. *Kansas,* 317 U.S. 213, 216 [63 S.Ct. 177, 87 L.Ed. 214]).

■ As a further ground for reversal, appellant insists that he was denied a fair and impartial trial because he was not taken before a magistrate within the time prescribed by

law. He asserts that he was taken into custody on April 16, 1958, and was not taken before a magistrate until April 22, 1958. Appellant asserts that, "This delay in taking the defendant before a magistrate and charging him, deprived the defendant, for six days, of precise knowledge of the crime he was supposed to have committed. This gravely jeopardized the defendant's chances of establishing his precise whereabouts on the day the crime was committed. The fact that sexteen days had already elapsed, when the defendant was arrested, left the defendant's chances of establishing his whereabouts precisely on April 1, 1958 uncertain. The additional six days delay, in taking the defendant before a magistrate, made it impossible for the defendant to establish his whereabout precisely on April 1, 1958." Under the facts advanced by appellant we shall consider that his contention refers to a violation of section 825 of the Penal Code which provides in part that, "The Defendant must in all cases be taken before the magistrate without unnecessary delay, and, in any event, within two days after his arrest, including Sundays and holidays . . . ." There is no support or even mention in the record of appellant's claim that he was held for six days before being taken before a magistrate, and no complaint of any such delay was made in the trial court. Such a complaint may not be urged for the first time on appeal (*People* v. *Watts*, 126 Cal.App.2d 659, 662 [272 P.2d 814]; *People* v. *McCrasky*, 149 Cal.App.2d 630, 637 [309 P.2d 115]). ▮ As was said by this court in *People* v. *McCrasky supra*, page 637: "Moreover, the violation of appellant's rights because of failure to observe the provisions of Penal Code, section 825, does not require a reversal unless there is a showing that such wrongful conduct resulted in an unfair trial. There is no such showing here. We are not here confronted with a case wherein an accused during the interim between his arrest and the claimed delay in bringing him before a magistrate, made any confessions, or that during such period anything occurred which militated against appellant at his trial. In these circumstances the violation of his constitutional and statutory rights immediately after his arrest cannot be said to have affected the outcome of his trial (citing cases)."

▮ The foregoing language is peculiarly applicable to the case at bar, wherein the claimed illegal detention did not so ". . . fatally (infect) the regularity of the appellant's trial and his conviction as to violate the fundamental aspects of

fairness and result in a miscarriage of justice" (*People* v. *Guarino*, 132 Cal.App.2d 554, 557, 558 [282 P.2d 538]). In the case now engaging our attention nowhere does it appear that appellant was not allowed to see an attorney during his alleged illegal detention nor does it appear that any incriminating statements which were used at his trial were made by him during this period.

Appellant's contention that he was denied a fair trial for the reason that evidence which was illegally seized was admitted into evidence is without merit. Since appellant, at the trial, made no objections to the introduction into evidence of the ball of twine found in his automobile, photographs of the vehicle, the registration slip for the same, the knife and loose-leaf notebook found in his locker, he waived his right to claim that the evidence was improperly received because it had been illegally obtained in contravention of the rule announced in *People* v. *Cahan*, 44 Cal.2d 434 [282 P.2d 905, 50 A.L.R.2d 513]. (See *Robison* v. *Superior Court*, 49 Cal.2d 186, 187 [316 P.2d 1]; *People* v. *Williams*, 148 Cal.App.2d 525, 532 [307 P.2d 48], and cases cited therein.)

Equally devoid of merit is appellant's contention that the trial judge "committed grave error in ordering the defense to limit final arguments to one hour" while "no such limit was placed on the District Attorney." The record does not reveal any such limitation, nor that any request was made by appellant's counsel for additional time within which to present argument to the jury, and there is nothing to show that all of the facts of the case were not fully and adequately brought to the attention of the jury, and nothing exists to indicate that any longer argument than was made would have been likely to change the result (*People* v. *Wellman*, 141 Cal.App.2d 101, 106, 107 [296 P.2d 82]). Other contentions that the trial judge allowed the deputy district attorney to "prompt and feed answers to the People's witness under cross-examination"; that the trial judge allowed, "the District Attorney to argue rulings of the Court without admonition or censure" and "refused this same privilege to the defendant's counsel and did admonish defense counsel when an attempt was made to argue a ruling of the Court," are not supported by the record, no objection was urged at the trial and the contention lacks substance here.

Appellant further contends that, "The trial judge erred in allowing testimony by Officer Thomas that imputed of

another crime." He refers to testimony to the effect that the prosecutrix had picked him "out of twenty mugs," manifestly referring to the identification of appellant by Mrs. Williams from some 20 pictures shown her. Appellant contends that since he was one of the persons shown in the 20 pictures, it was pointed out to the jury that he was a felon. However, at the trial appellant made no objection in any form, nor did he make a motion to strike the claimed improper testimony in either instance. This complaint cannot be urged for the first time on appeal (*People* v. *Lawrence*, 143 Cal. 148, 156 [76 P. 893, 68 L.R.A. 193]; *People* v. *Glass*, 127 Cal.App.2d 751, 753 [274 P.2d 430]). ▮ The other testimony which appellant asserts tended to impute other crimes to him was testimony by Officer Thomas that appellant was "under investigation on another matter." This complaint is totally devoid of merit because the record reveals that the challenged testimony was given under the following circumstances:

"Q. By MR. BODLEY: This suit was introduced May 1st. Did you have occasion after May 1st, 1958, to go back to the Blankenship house and search it again?

"THE COURT: Objection overruled.

"THE WITNESS: I did not, but I know what you are talking about.

"Q. By MR. BODLEY: What am I talking about?

"A. Mr. Blankenship was under investigation on another matter, and some other officer went to the house and I went with him just to show him the house." It is immediately apparent that the statement complained of was made in response to a question propounded by appellant's own counsel, and it is clear that he invited the statement and made no objection to it or motion to strike the same.

▮ It is next contended by appellant that the trial court erred in refusing to give the following instruction requested by him:

"A witness false in one part of his testimony is to be distrusted in others; that is to say, you may reject the whole testimony of a witness who wilfully has testified falsely as to a material fact, unless, from all the evidence, you shall believe that the probability of truth favors his testimony in other particulars."

The court, however, did instruct the jury that:

"A witness wilfully false in one material part of his or her testimony is to be distrusted in others. The jury may

reject the whole of the testimony of a witness who has wilfully sworn falsely as to a material point. (If you are convinced that a witness has stated what was untrue as to a material point, not as a result of mistake or inadvertence, but wilfully and with the design to deceive, then you may treat all of his or her testimony with distrust and suspicion, and reject all unless you shall be convinced that he or she has in other particulars sworn to the truth)."

Since the instruction given correctly stated the law and substantially covered the issues presented by the proffered instruction, the refusal to give the latter is not error (*People v. Denton*, 78 Cal.App.2d 540, 552 [178 P.2d 524]; *People v. Kennedy*, 21 Cal.App.2d 185, 201, 202 [69 P.2d 224]).

■ Appellant also predicates error upon the refusal of the court to give the following instruction on evidence susceptible to two different constructions:

"If the evidence in this case (as to any particular count) is susceptible of two constructions or interpretations, each of which appears to you to be reasonable, and one of which points to the guilt of the defendant, and the other to his innocence, it is your duty, under the law, to adopt that interpretation which will admit of defendant's innocence, and reject that which points to his guilt.

"You will notice that this rule applies only when both of the two possible opposing conclusions appear to you to be reasonable. If, on the other hand, one of the possible conclusions should appear to you to be reasonable and the other to be unreasonable, it would be your duty to adhere to the reasonable deduction and to reject the unreasonable, bearing in mind, however, that even if the reasonable deduction points to defendant's guilt, the entire proof must carry the convincing force required by law to support a verdict of guilt."

The proposed instruction correctly states the law and should be given whenever proof of some essential fact is necessary to sustain a verdict against an accused, and the proof of such fact *depends upon circumstantial* evidence. However, where, as here, the prosecution relies for conviction upon direct evidence, *the circumstantial evidence, if any, being merely incidental to and corroborative of the direct evidence, an instruction on the law of circumstantial evidence need not be given* (*People v. Coontz*, 119 Cal.App.2d 276, 281 [259 P.2d 694]; *People v. Lonnen*, 139 Cal. 634, 637 [73 P. 586]; *People v. Wood*, 129 Cal.App.2d 823, 826, 827 [277 P.2d 832]). In

the case at bar, the testimony of the prosecutrix was direct and was evidently the basis for conviction. While circumstantial evidence was introduced to show that appellant was the person who attacked Mrs. Williams, such evidence was merely incidental to and corroborative of Mrs. Williams' unequivocal identification of appellant on three different occasions. In harmony with the decisions above cited, it appears to be a reasonable conclusion that the court did not err in refusing the proffered instruction.

█ Finally, appellant seemingly contends that the trial court should have commented upon certain phases of the testimony of the complaining witness. While it is true that the trial court is invested with the privilege of commenting on the evidence pursuant to the provisions of article VI, section 19 of our state Constitution, no duty is imposed upon the court so to do (*People* v. *Ottey*, 5 Cal.2d 714, 728 [56 P.2d 193]; *People* v. *Briley*, 9 Cal.App.2d 84, 87 [48 P.2d 734]; *People* v. *Friend*, 50 Cal.2d 570, 576 [327 P.2d 97]).

We have carefully and painstakingly scrutinized the record and have failed to find any legal reason for disturbing the verdict.

The judgment and the order denying defendant's motion for a new trial are, and each is therefore affirmed.

Fourt, J., and Lillie, J., concurred.

A petition for a rehearing was denied June 15, 1959.