[Crim. No. 43542. Second Dist., Div. Five. May 15, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
GARY LYNN HARPOOL, Defendant and Appellant.

Norman W. de Carteret, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, John R. Gorey and Donald E. De Nicola, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**STEPHENS, Acting P. J.**—Gary Lynn Harpool appeals from his June 23, 1982, conviction of first degree murder (Pen. Code, § 187) with the use of a firearm (Pen. Code, §§ 12022.5 and 1203.06, subd. (a)(1)), and robbery (Pen. Code, § 211) with the use of a firearm (Pen. Code, §§ 12022.5 and 1203.06, subd. (a)(1)).[1] He contends that:

(1) Defendant was denied a fair trial because a key witness' grant of immunity was conditioned upon his testifying in a manner implicating defendant in the murder;

(2) Defense counsel acted incompetently in failing to move to suppress the in-court identification of a witness who had failed to identify defendant at a pretrial lineup;

(3) Defendant was improperly convicted in that the only evidence linking him with the crime came from the mouth of an accomplice to the crimes;

(4) Defendant was improperly convicted of felony murder, which specie of murder does not exist in California; and

We have concluded that there is no merit to any of these contentions.

### FACTS

This case involves the April 6, 1981, robbery and murder of Kim Hee Ok while she was working at the Fair Market in Santa Monica. The scenario posed in connection with the aforementioned crimes is developed from the evidence adduced at trial. Perhaps the bulk or framework of the prosecution's evidence was provided by Willie Star, who admitted a limited participation in defendant's crimes. Star was given immunity from prosecution upon the rendering of his testimony at the preliminary hearing.

Star claimed that he met defendant at a Santa Monica beach on the day of the shooting, April 6, 1981. They smoked marijuana together and later retired to Star's nearby apartment. There defendant put on a pair of short pants and a T-shirt belonging to Star because it was a hot day.

Sometime after, or during the course of defendant's change of clothes, Star noticed a birth certificate and a Greyhound bus ticket that had fallen

---

[1]Originally defendant Harpool was found guilty of special circumstances murder (Pen. Code, § 190.2, subd. (a)(17)); however, this special circumstance was later stricken by the court pursuant to Penal Code section 1385.

from defendant's jacket. Upon closer examination, Star determined that the birth certificate contained the defendant's name, Gary Lynn Harpool. Although defendant had previously given Star the name "Steve" upon confrontation with the fallen certificate, he explained his name was as appeared on the certificate.[2]

Later Star showed defendant a pistol and some ammunition which led to defendant's boasting of committing past robberies. From the discussion of robbery, the two men eventually settled upon a plan to rob the local "Fair Market," a small convenience store located nearby. Star loaded his gun and gave it to defendant, who carried it in the front of his trousers.[3]

Star's narrative continues with the explanation that because he had passed a bad check at the market, defendant entered alone. Star evidently continued past the market, stopping at or near a small park to wait for defendant. Star recalled that approximately a minute after defendant's entry into the market, he heard a shot fired. In less than a minute, Star observed defendant running in his direction holding the waistband of his shorts. Star asked him about the gunshot but received no reply.

Star led defendant to the apartment of Star's acquaintance, Neil Klemow. In Klemow's bathroom, defendant gave the gun to Star. Defendant then sat on the couch in the living room, while in the bedroom Star told Klemow of the robbery and a possible "shooting." After removing the remaining bullets from the pistol, Star gave the gun to Klemow who placed it in a shoe box.

Returning to the living room, Star asked defendant what had happened. Defendant is said to have indicated nonverbally that he had shot someone in the shoulder.

Star tells of later depositing the remaining bullets in a trash bin outside Klemow's apartment and that both he and defendant eventually returned to his apartment. There defendant dressed in his own clothes and told Star that he (defendant) was leaving for the Greyhound Bus Station. Sometime after defendant left Star's apartment, Star telephoned the Santa Monica police and reported that a pair of transients had stolen his gun. Later in the evening, Star recanted his claim that his gun had been stolen and eventually rendered an account of the robbery implicating defendant as the triggerman.

---

[2] On cross-examination, Star confessed not being totally sure about defendant's use of the name Steve.

[3] Star later refers to the trousers as "his shorts," leading to the probable intention that Star was referring to the short pants Star had lent defendant.

Witness Neil Klemow gave testimony corroborative of Willie Star's version of the facts. Although unable to identify defendant from a pretrial lineup, but able to identify defendant at a preliminary hearing and at trial, Klemow recalled seeing Star and defendant push their way into his apartment and go directly to the bathroom. Klemow also recalled taking the pistol from Star and putting it in a shoe box after Star unloaded it. Klemow was able to describe defendant's appearance, i.e., the T-shirt and shorts, and identify defendant and the subject articles of clothing in the courtroom.

Klemow stated that while in his apartment he asked defendant what had happened. At first defendant is said to have stated, "It's over. Nothing can be done about it." Then defendant said that ". . . he had gone into the store and he had raised the gun and the girl had pressed the alarm. When he heard the alarm go off, the gun went off."[4] Also, he recalled being told by defendant about "heading out" to Tennessee or Kentucky.

Sometime after both Star and defendant had left Klemow's apartment, Klemow learned of the "Fair Market" holdup from a television news report. After seeking advice from his attorney, Klemow went to the police with his knowledge of the robbery and later led them to the gun.

Supportive of the aforementioned testimony is witness Lisa Hutchinson's rendition of the facts. A passerby in the vicinity of the market at roughly the same time or shortly after the robbery, this witness recounted seeing a man who looked like defendant walking rapidly in her direction. She thought the man was a dark complected black man in his 20's who was stuffing something wrapped in cellophane into his short pants. Hutchinson stated that she thought that pastry was wrapped in the cellophane. Witness Hutchinson also recalled that the man ran in the direction of the nearby park.

Hutchinson admitted being unable to identify defendant at a lineup; however, she was able to identify him in the courtroom. Similarly, she was not certain that she could identify the short pants worn by the man she saw on the date of the robbery as the pants comprising one of the exhibits admitted by the prosecution.

Based upon information obtained from another witness at the scene, Officer Cooper of the Santa Monica Police Department testified that shortly after arriving at the crime scene, he walked along the route taken by the assailant after the robbery. Officer Cooper discovered a crumpled cellophane package containing a cookie lying on the sidewalk.

---

[4]Other evidence established that the store was not equipped with such a warning device.

Victor Alferas, an employee of the Santa Monica Police Department in the capacity of an identification technician, established that the cellophane package contained one of defendant's fingerprints.

The officer in charge of investigating the robbery, Detective Wilson, testified that he found the short pants Star had lent to defendant in Star's apartment. He also recalled personally retrieving the gun from the shoe box and the bullets from the trash bin at Klemow's apartment.

Defendant was eventually picked up and arrested in Blythe, California apparently on the first leg of a trip to Bowling Green, Kentucky. At the time of defendant's arrest, the arresting officer discovered on defendant's person the bus ticket and birth certificate Star had seen earlier.

Contrary to the facts suggested by the above evidence, defendant's position is that he had made plans in advance to leave Los Angeles for his home in Kentucky on April 6, 1981. He met Willie Star in the afternoon and showed him his birth certificate. He also recalled handling a cellophane package containing cookies, offered him by Star. However, he denied ever meeting with Neil Klemow or going to the Fair Market. Also, defendant emphasizes the fact that when he was taken into custody by the police in Blythe, he had very little cash on his person.

## DISCUSSION

This case was accepted for review by the Supreme Court and thereafter returned to this division for "reconsideration of its opinion in light of *People* v. *Dillon* (1983) 34 Cal.3d 441, 476-489 [194 Cal.Rptr. 390, 668 P.2d 697]." We therefore refile our original opinion with modification relative to defendant's fourth argument which is treated under "IV."

### I

Defendant's first point of error rests with the grant of immunity given Willie Star. Defendant contends that the terms of Star's grant of immunity, for all practical purposes, tainted that witness' testimony in that it was conditioned upon him testifying at trial in conformity with his testimony given at a preliminary hearing incriminating defendant in the murder and robbery. Expressed in another way, defendant argues that the promise of immunity, by its terms, unduly influenced Star's recriminating testimony at trial.

Defendant's argument is predicated upon certain language appearing in a memorialization of the immunity agreement reached between Star and the

prosecution. The agreement states: "Mr. Star has made a previous statement to Investigating Officer Charles Wilson in relation to these matters. It is expected that Mr. Star's testimony will generally follow and encompass the same points."

Albeit within the realm of possibility that said language may have been intended as a less than subtle attempt to remind or induce Star to testify at trial, as he had at the preliminary hearing, there is other language appearing in the agreement that suggests otherwise. Defendant has neglected to address the fact that the quoted language is followed by the statement, "The main consideration is that Mr. Star tell the entire truth." From our perspective, this conveniently overlooked statement compels the more reasonable interpretation that said language merely identified the subject matter about which the expected truthful testimony would earn Star immunity.

In this respect, said agreement is quite dissimilar from the immunity agreement in *People* v. *Medina* (1974) 41 Cal.App.3d 438 [116 Cal.Rptr. 133], cited by defendant. Further, the language defining the scope of Star's testimony did not even purport to create a condition "that the witness not materially or substantially change" his previous statement while testifying at trial. (*Id.,* at p. 450.) As the Attorney General correctly notes, "The immunity agreement covering Star's preliminary hearing testimony set up only one condition, explicit or implicit, actual or imagined: Star had to testify *truthfully.*" (Italics ours.)

Defendant's argument suffers from another flaw. The record reflects that Star had received immunity or its functional equivalent "conditioned absolutely upon Mr. Star telling the complete truth," upon the completion of his testimony *at the preliminary hearing.* Pursuant to the agreement Star made with the Attorney General, after Star testified at said hearing, the prosecutor moved to carry out the agreement by requesting immunity for Star and dismissing the charges against him.

We might agree that it is conceivable that a situation might exist where a defendant might give perjured or otherwise "tainted" testimony under the fear of prosecution, pursuant to a promise of immunity at one hearing, and perpetuate said testimony under the mistaken belief that said immunity could be rescinded. Here, there is no evidence suggestive of this occurrence. Accordingly, we are loathe to presume so. Additionally, we cannot ignore the fact that the immunity agreement clearly and unambiguously specified that "the testimony given by Mr. Star [at the preliminary hearing] will not be used in any way against Mr. Star nor Mr. Harpool in any further criminal proceedings related to the pending criminal matters."

There is no evidence that the promise of immunity induced Star to testify in anything but a truthful manner. Whether Star did, in fact, testify truthfully was an issue which did not go unaddressed at trial in the form of a noteworthy attempt at impeachment by defendant's counsel during Star's cross-examination. As with all witnesses, the fact-finder, in this case the trial judge, was entitled to accredit Star's testimony with whatever value it deserved. The terms of Star's grant of immunity did not deprive defendant of a fair trial.

## II

■ Defendant next contends that his trial counsel acted incompetently in failing to move to suppress Mr. Klemow's in-court identification of defendant. His argument is predicated upon Mr. Klemow's previous failure to so identify defendant at an earlier lineup, coupled with the fact that he later identified defendant while defendant was singled out in the courtroom at a preliminary hearing. There is no question that Mr. Klemow's identification could have been as a result of obviously suggestive circumstances.[5] However, it is not clear that defendant's counsel's failure to so object established incompetency on the part of same.

From our perspective, it would appear that a motion to suppress Klemow's in-court identification at trial, founded on the fact that Klemow's earlier identification at the preliminary hearing was made under suggestive circumstances, would most likely have been futile. Assuming that Klemow's identification of defendant at the preliminary hearing was in fact the product of an unfairly suggestive procedure, said identification was not entirely barred from use at trial. ■ The law is clear that tainted or otherwise questionable identification evidence can be "rehabilitated" provided the prosecution establishes through clear and convincing evidence that the in-court identification is based upon independent or otherwise uncontaminated observations or perceptions of the accused. (See *People* v. *Bisogni* (1971) 4 Cal.3d 582, 587 [94 Cal.Rptr. 164, 483 P.2d 780]; *People* v. *Caruso* (1968) 68 Cal.2d 183, 189-190 [65 Cal.Rptr. 336, 436 P.2d 336].)

In the instant case, there is no question that Klemow's initial inability to identify defendant makes his one-on-one showup at the preliminary hearing less positive than it could be. ■ Nevertheless, at trial Klemow established that his in-court identification was the product of his personal experience at the time of the crimes and not predicated on his exposure to de-

---

[5]See *People* v. *Sanchez* (1982) 131 Cal.App.3d 718 [182 Cal.Rptr. 671] for a list of various factors to be considered in determining the likelihood of irreparable misidentification due to improper identification procedures.

fendant at either the lineup or the preliminary hearing. Klemow testified that at his apartment he observed defendant for about 15 or 30 minutes at a time close to the crimes and that he had been attentive to defendant, a stranger who had presented himself under extraordinary and suspicious circumstances. Equally significant, if not more important, is the fact that Klemow was quite certain with respect to defendant's very distinct dental features[6] and that he had heard defendant's intentions to travel to Kentucky or Tennessee. Both of these assertions were independently corroborated respectively by the trial court's own view of defendant's teeth and the fact that defendant was arrested on a bus destined for Kentucky and Tennessee. Accordingly, on the basis of an independent set of observations, Klemow's identification appears to have been proper, making an objection unnecessary and therein falls short of establishing the existence of defense counsel's asserted incompetency. ■ "Counsel is not required to make futile objections or motions merely to create a record impregnable to assault for claimed inadequacy of counsel." (*People* v. *Weston* (1981) 114 Cal.App.3d 764, 780 [170 Cal.Rptr. 856]; *People* v. *Jones* (1979) 96 Cal.App.3d 820, 827 [158 Cal.Rptr. 415].)

Assuming, arguendo, that Klemow's testimony was inadmissible as a matter of law, we would still be unable to conclude that a failure to make the appropriate motion to suppress or exclude said testimony constituted ineffective assistance of counsel. ■ Our Supreme Court has enunciated that in order for a defendant to prevail on a claim that he was incompetently represented, he bears the burden of demonstrating that, for unacceptable reasons apparent on the record, trial counsel's failure to act as a reasonably competent attorney deprived him of a more favorable result at trial. (*People* v. *Fosselman* (1983) 33 Cal.3d 572, 584 [189 Cal.Rptr. 855, 659 P.2d 1144]; *People* v. *Pope* (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].) The record simply reflects that *all* parties, including the court, were aware of Klemow's perceptive shortcomings. Aside from the thorough cross-examination of Klemow by defendant's trial counsel on this point, we note that even the prosecutor conceded that he was "not at all enthusiastic about Klemow," and that "we do have our problems with identification by Mr. Klemow." Similar sentiment can be found in the words of the prosecutor at the preliminary hearing who intoned, "I don't expect the court to accept Mr. Klemow's identification of the defendant in court. That has, I think, absolutely no weight." Finally, and most importantly, the court itself made no secret that it had concerns regarding identification testimony which, of course, included Klemow's.

"[THE COURT]: I suggest that at this particular stage of the proceedings, that the identification, unsatisfactory though it is on its own, the testimony

---

[6]For some unknown reason, defendant's unusual teeth went unnoticed at the lineup.

of the accomplice Star, unsatisfactory and subject to distrust as it was on its own, the testimony of Klemow, to some extent not as satisfactory as one would like—his motivation obviously being one to exonerate himself from something less than the highest activities of an interested citizen and his somewhat equivocal identification, . . ."

In view of the foregoing, it is obvious that the court attributed very little value to Klemow's testimony, at least insofar as the testimony was based upon the witness' impressions of defendant's general physiognomy and physique.

Apart from the court's indicated awareness of Klemow's faults, identification evidence provided by Lisa Hutchinson and Victor Alferas, a fingerprint expert, by itself provided sufficient proof to establish defendant's identity. ■ Thus, Klemow's testimony was anything but "crucial." Here there is little doubt that both the direct and circumstantial evidence presented overwhelmingly favored defendant's guilt. Weighing strong evidence of defendant's guilt against the minimized impact of Klemow's in-court identification, it is difficult to find that suppression of the in-court identification would have gained defendant a more favorable result. Defendant was not ineffectively represented by counsel at trial. (See *People* v. *Fosselman, supra*, 33 Cal.3d at p. 584; see also *Chapman* v. *California* (1966) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065], rehg. den. 386 U.S. 987 [18 L.Ed.2d 241, 87 S.Ct. 1283].)

### III

■ Defendant's next challenge rests with the sufficiency of the evidence. Specifically, defendant argues that outside of accomplice Willie Star's testimony, no other witness connected defendant with the crimes or sufficiently corroborated Star's testimony so that he could be convicted. This argument, like its predecessors, is without merit.

It is true that a defendant cannot be convicted upon the uncorroborated testimony of an accomplice. (Pen. Code, § 1111.) Nevertheless, the record is replete with evidence corroborative of accomplice Star's testimony. Witness Hutchinson observed a man strangely resembling defendant run from the market at the time of the shooting. Along the path of the fleeing man, the police found merchandise from the market bearing defendant's fingerprint. Witness Klemow, who lived in the immediate vicinity of the market, testified that he permitted defendant and Star into his apartment around the time of the murder, received from Star the actual murder weapon, and heard defendant admit that ". . . he had gone into the store and he had raised the gun and the girl had pressed the alarm. When he heard the alarm go off,

the gun went off." In addition, the police intercepted defendant on the evening of the crime in his apparent attempt to flee the jurisdiction by bus. All of this evidence, coupled with the fact that Ms. Hee Ok had been shot to death at the market where she was working at the time in question, amply corroborated Star's testimony regarding defendant's participation in the robbery/murder. The totality of the evidence, viewed in a light most favorable to respondent, sufficed to prove defendant's guilt beyond a reasonable doubt. (See *People* v. *Johnson* (1980) 26 Cal.3d 557, 558 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].)

## IV

In defendant's fourth and final argument, he claims that the evidence established, at best, only an intention to commit robbery and that someone was killed during the robbery; consequently, the evidence was insufficient for conviction of murder. In essence, defendant is asking us to abrogate the felony-murder rule; however, this we cannot do. This contention has been answered adversely to defendant's position in *People* v. *Dillon* (1983) 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697]. The rationale need not be repeated here.

We have been directed to reconsider this case in the light of *Dillon.* Our initial opinion cited *Dillon* but we were of the view that the patent factual differences between those in that case and those in the case before us justified the conviction of first degree murder here. These factual differences are many, but the following appear to us to highlight the distinction so well drawn by Justice Mosk, writing the majority opinion in *Dillon,* where it is stated: ". . . in the case of deliberate and premeditated murder with malice aforethought, the defendant's state of mind with respect to the homicide is all-important and must be proved beyond a reasonable doubt; in the case of first degree felony murder it is entirely irrelevant and need not be proved at all." (*Id.,* at pp. 476-477.)

Proceeding, however, to the question of the cruel and unusual punishment consideration by the court, the majority said: "In the exercise of [the consideration of whether the prohibition against cruel and unusual punishment is involved] we adopted in *Lynch* [(1972) 8 Cal.3d 410 (105 Cal.Rptr. 217, 503 P.2d 921)] the rule that a statutory punishment may violate the constitutional prohibition not only if it is inflicted by a cruel or unusual method, but also if it is grossly disproportionate to the offense for which it is imposed." (*People* v. *Dillon, supra,* 34 Cal.3d at p. 478.)

The "techniques" identified in *People* v. *Lynch* (1972) 8 Cal.3d 410, 425-429 [105 Cal.Rptr. 217, 503 P.2d 921] to aid in determining proportionality

call first for an examination of "the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society." (*Id.*, at p. 425.)

*Dillon* states: "With respect to 'the nature of the offense,' we recognize that when it is viewed in the abstract robbery-murder presents a very high level of such danger, second only to deliberate and premeditated murder with malice aforethought. In conducting this inquiry, however, the courts are to consider not only the offense in the abstract—i.e., as defined by the Legislature—but also 'the facts of the crime in question' (*In re Foss* (1974) *supra,* 10 Cal.3d 910, 919 [112 Cal.Rptr. 649, 519 P.2d 1073])—i.e., the totality of the circumstances surrounding the commission of the offense in the case at bar, including such factors as its motive, the way it was committed, the extent of the defendant's involvement, and the consequences of his acts.

"Secondly, it is obvious that the courts must also view 'the nature of the offender' in the concrete rather than the abstract: although the Legislature can define the offense in general terms, each offender is necessarily an individual. Our opinion in *Lynch,* for example, concludes by observing that the punishment in question not only fails to fit the crime, 'it does not fit the criminal.' (8 Cal.3d at p. 437.) This branch of the inquiry therefore focuses on the particular person before the court, and asks whether the punishment is grossly disproportionate to the defendant's individual culpability as shown by such factors as his age, prior criminality, personal characteristics, and state of mind." (34 Cal.3d at p. 479.)

Applying these "techniques," we observe that defendant conceived the plan to commit the robbery. He armed himself with a .38 caliber handgun. He explained to Star (a witness) his "skills of pulling burglaries and robberies." He went to a small market where a sole cashier (and fill-in manager) was working. He rifled the cash register and shot to death a particularly vulnerable young woman, who was unarmed at the register and without any warning device to give notice of the robbery. He sought to escape detection by leaving the state for Kentucky. And, last but not least, his defense was alibi and complete denial. Certainly both facets of *Lynch* were answered. Here, the facts may well have fallen short of premeditation and deliberation but this felony murder certainly "presents a very high level of such danger, second only to deliberate and premeditated murder with malice aforethought."

As to the "punishment fitting the crime," we note that the prosecution exercised its discretion and considered factors in mitigation, i.e., the young age of defendant and no felony priors, and concluded not to seek the death

penalty. At the time of sentence, the court further exercised its discretion, again considering all of the mitigating factors as it saw them. It concluded that life in prison without possibility of parole was too severe. It struck the special circumstances allegation, thus permitting it to sentence defendant to 25 years to life plus 2 years for the gun use. It noted that parole would be possible after 18 years but the court recognized serious psychological problems and recommended Vacaville incarceration with no release until there was "clear and convincing evidence that he could be safely released into the community."

When all of the above factors are balanced against the mitigating factors in *Dillon* (not the least of which was that decedent was himself in the performance of a crime), and the severity of penalty in that case (life imprisonment), we conclude that the judgment in the instant case warrants no further reduction.

The judgment is affirmed.

Ashby, J., and Hastings, J., concurred.

A petition for a rehearing was denied June 4, 1984, and appellant's petition for a hearing by the Supreme Court was denied July 12. 1984.