[No. E018588. Fourth Dist., Div. Two. Mar. 12, 1998.]

THE PEOPLE, Plaintiff and Respondent, v.
PAMOT JOEY THONGVILAY et al., Defendants and Appellants.

**COUNSEL**

Gregory Marshall and Ava R. Stralla, under appointments by the Court of Appeal, for Defendants and Appellants.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General,

Pamela A. Ratner and Garrett Beaumont, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**HOLLENHORST, Acting P. J.**—This is a joint appeal by defendants Pamot Joey Thongvilay (herein Thongvilay) and Done Naly (herein Naly) whom separate juries found guilty of first degree murder in connection with the death of Joann Jacobs (herein Ms. Jacobs) who was killed in an automobile collision with defendants. The murder was prosecuted on a felony-murder theory, specifically, that the death occurred in the course of an automobile burglary in which defendants stole the radio from a car and were pursued by the boyfriend of the owner of the burglarized car. In an effort to evade his pursuer, Thongvilay drove through an intersection against a red light and crashed into the car driven by Ms. Jacobs. As a result of the collision she died.

### Procedural Background and Facts

Around 1 a.m., March 30, 1995, Charles Cabral (herein Mr. Cabral) was standing in the driveway of his girlfriend's house in Riverside when he saw defendants breaking into his girlfriend's car. He yelled, "I don't think my stereo's your style," but defendants continued committing the crime as if they did not hear him. Mr. Cabral walked into the house to call 911. While he was on the phone, he continued to watch defendants outside the front window. As he was on the phone, his girlfriend's dad came downstairs and turned on the porch light. Shortly thereafter, defendants returned to their car and pulled away.

Mr. Cabral grabbed the keys to his girlfriend's car and ran outside to follow defendants. When he got to the car, the passenger door was open all the way. He closed the door, walked around the car and got into the driver's side. As he noticed that the stereo was missing, he started the car and drove to a street exiting the housing tract to intercept defendants and get their license plate number. There are only two ways in and two ways out of the housing tract where Mr. Cabral's girlfriend lived. When defendants saw Mr. Cabral pursuing them, they gave him an "oh shit" look and swerved around a corner to escape. As Mr. Cabral gave chase, defendants sped away.

Defendants' car struck Ms. Jacobs's car and killed her when they drove through a red stoplight while attempting to elude Mr. Cabral.

In an information filed by the Riverside County District Attorney's Office, defendants were charged with the murder of Ms. Jacobs (Pen. Code, § 187)[1] and auto burglary (§ 459). The information also charged Thongvilay with an earlier burglary.

Neither defendant testified at trial; however, Thongvilay's counsel conceded, in her argument to the jury, that he was guilty of burglary and of vehicular manslaughter. Separate juries found defendants guilty of first degree felony murder and second degree auto burglary. Thongvilay pled guilty to the earlier burglary. On June 7, 1996, Thongvilay was sentenced to state prison for 25 years to life. The term for his auto burglary was stayed pursuant to section 654. On the same day, the trial court modified Naly's murder conviction to second degree murder and sentenced him to state prison for 15 years to life, also staying the term for his auto burglary pursuant to section 654.[2]

*The Felony-murder Doctrine Applies When, as Here, Defendants Caused a Death While Driving Away After Committing a Second Degree Burglary*

 Felony-murder liability continues throughout the flight of a perpetrator from the scene of a robbery until the perpetrator reaches a place of temporary safety because the robbery and the accidental death, in such a case, are parts of a "continuous transaction." (*People* v. *Ainsworth* (1988) 45 Cal.3d 984, 1016 [248 Cal.Rptr. 568, 755 P.2d 1017].) However, Thongvilay contends that this rule should not be extended to include this case because the burglary itself, unlike robbery, was not a crime involving danger to life. Thus, he maintains that his case should not be subjected to application of the first degree felony-murder rule. We disagree.

As Thongvilay acknowledges, this same issue was raised and rejected in *People* v. *Fuller* (1978) 86 Cal.App.3d 618 [150 Cal.Rptr. 515] and *People* v. *Bodely* (1995) 32 Cal.App.4th 311 [38 Cal.Rptr.2d 72]. We agree with the *Fuller* and *Bodely* courts and thus reject defendant's contention for the reasons stated therein.

*The Evidence Supports Defendants' Convictions*
*of First Degree Felony Murder*

It was the prosecution's theory that defendants killed Ms. Jacobs during the commission of the burglary and, therefore, were guilty of first degree

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] The abstract of judgment incorrectly states that Naly was sentenced for first degree murder. We shall order the trial court to correct it.

felony murder under section 189. The trial court instructed the jury,[3] "For the purposes of determining whether an unlawful killing has occurred during the commission . . . of burglary, the commission of the crime of burglary is not confined to a fixed place or a limited period of time. . . . [¶] A burglary is in progress after the original entry while the perpetrator is fleeing in an attempt to escape. Likewise, it is still in progress so long as immediate pursuers are attempting to capture the perpetrator or to regain stolen property. [¶] A burglary is complete when the perpetrator has eluded any pursuers and reached a place of temporary safety."

The foregoing jury instruction, a nearly verbatim recitation of CALJIC former No. 14.55,[4] is based on *People v. Bodely, supra,* 32 Cal.App.4th 311, in which our colleagues in the Sixth District affirmed a first degree felony-murder conviction resulting from a burglary where the defendant ran into a supermarket, took $75 from a cash register and ran out of the store. Several store employees chased the defendant into the parking lot where a man (presumably a customer but apparently not an employee) also joined in the chase. When the defendant started to drive away, the man tried to stop him, first by standing in front of the defendant's oncoming car and putting his hands on the hood, and then by reaching his arm in the driver's side window. As defendant drove off, he jerked his car to the left, causing the man to fall from the hood. In doing so, the man struck the back of his head on the pavement and he died from that injury.

In concluding the foregoing facts supported the defendant's first degree felony-murder conviction, the Sixth District applied the "escape rule" or the "one continuous transaction rule" which evolved from robbery cases based on the view "that the perpetration of a *robbery* continues, for felony-murder liability purposes, so long as the robbers are in flight from the scene of the crime and have not reached a place of temporary safety. [Citations.]" (*People v. Bodely, supra,* 32 Cal.App.4th 311, 313, original italics, citing *People v. Boss* (1930) 210 Cal. 245, 250-251 [290 P. 881] and *People v. Salas* (1972) 7 Cal.3d 812, 823 [103 Cal.Rptr. 431, 500 P.2d 7, 58 A.L.R.3d 832].) As the *Bodely* court observed, "While this so-called 'escape rule' was originally justified by an analysis based on when the crime of robbery was 'complete,' the California Supreme Court has more recently explained that the duration of felony-murder liability is not determined by considering whether the felony itself has been completed. Instead, 'the homicide is

---

[3]Defendants were tried in a single proceeding but with separate juries. However, the trial court instructed both juries on first degree felony murder, as set out above. Therefore, in using the singular term "jury," we intend to refer to both juries.

[4]CALJIC former No. 14.55 was new in 1996 (see *Id.* (1996 new) (5th ed. pocket pt.) at p. 114) and carried over into the recently issued sixth edition as CALJIC No. 8.21.2.

committed in the perpetration of the felony if the killing and the felony *are parts of one continuous transaction.*' [Citation.]" (*Bodely, supra,* at p. 313, original italics, citing *People* v. *Ainsworth, supra,* 45 Cal.3d 984, 1016.) Thus, the Sixth District concluded, "If we apply this 'one continuous transaction' analysis, no rationale supports limiting the escape rule exclusively to robbery. The perpetrator's immediate escape from the scene of a crime is no less a part of the same continuous transaction which includes the crime when the crime is burglary than when the crime is robbery. Burglary and robbery, like many other crimes, are generally technically 'complete' for purposes of criminal liability prior to the escape of the perpetrator. However, 'the escape rule serves the legitimate public policy considerations of deterrence and culpability' by extending felony-murder liability beyond the technical completion of the crime. [Citation.] While the California Supreme Court has never actually decided the precise issue raised here, its various statements on this subject reflect that the escape rule is not limited to the crime of robbery." (*Bodely, supra,* at pp. 313-314; see also *People* v. *Fuller, supra,* 86 Cal.App.3d 618.)

Here, defendants contend that there is insufficient evidence to support the jury's first degree felony-murder conviction because the death of Ms. Jacobs did not occur during their immediate flight from the car burglary and before they had reached a place of temporary safety. We disagree.

█ When faced with a claim that the evidence is insufficient to support the verdict, we "review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) "Substantial evidence must be more than evidence which merely raises a strong suspicion of guilt as mere suspicion will not support an inference of fact." (*People* v. *Martin* (1973) 9 Cal.3d 687, 695 [108 Cal.Rptr. 809, 511 P.2d 1161].)

█ Here, the jury was instructed on the felony-murder rule. During closing argument, counsel for both defendants analyzed the facts and argued that they were insufficient to support a finding that the accident occurred while defendants were "fleeing" from the burglary. Counsel were diligent in their claim that defendants had reached a "place of temporary safety." Nonetheless, the jury found otherwise. We find sufficient evidence to support its conclusion.

Mr. Cabral testified that he watched defendants as they were burglarizing his girlfriend's car. While he was on the phone with 911, he continued to

watch them. Simultaneously, his girlfriend's father turned on the front porch light. Once the light was turned on defendants returned to their car and took off. They left the passenger door of the burglarized car wide open in their haste to leave. However, not wanting to attract more attention, they left the scene driving in a normal manner, as if nothing had happened. Nonetheless, Mr. Cabral immediately got the keys to his girlfriend's car to pursue defendants. Because there were only two ways in and two ways out of the housing tract, Mr. Cabral knew that if he took the shortcut, he could cut defendants off "at the pass." Sure enough, he did. When defendants saw Mr. Cabral, they knew that they had not escaped undetected. However, they were not willing to give up the fight. Instead, they turned their headlights off and proceeded to speed away. In their attempt to "lose" Mr. Cabral, they crashed into Ms. Jacobs's car, causing her death.

Like the jury, we find that the above evidence supports a finding that defendants had failed to reach a place of temporary safety before they caused the accident which took the life of Ms. Jacobs.

The dissent disagrees. Instead, the dissent concludes "as a matter of law . . . the death and the burglary were not part of *one continuous transaction*." (Dis. opn., *post*, at p. 90.) To reach this conclusion, the dissent describes defendants' flight from the scene of the burglary as one where defendants simply "left the crime scene." (*Id.* at p. 91.) Likewise, it observes that there was no immediate pursuit of defendants. In response to the dissent's observations, we find ourselves asking two questions. First, if defendants simply "left the crime scene," then why did they leave the passenger door of the burglarized car wide open? To us, such evidence suggests that defendants felt the need to leave the crime scene in a hurry and thus, the simple act of closing the passenger door would have delayed their departure. In response, the dissent finds such fact irrelevant. Instead, the dissent observes "[d]efendants were burglars, after all, [and o]rdinarily burglars are not so courteous as to tidy up when they leave . . . ." (*Id.* at p. 92, fn. 4.) However, if defendants were "presumably looking for another car to burglarize," (*id.* at p. 90.) upon leaving the present crime scene, why would they want to call attention to the fact that some nefarious act had just occurred on one car?

Second, if Mr. Cabral's actions did not constitute an immediate pursuit of defendants, what actions would have? Mr. Cabral testified that he continued to watch defendants as he called 911. However, when his girlfriend's father turned the front porch light on, defendants took flight. Mr. Cabral raced to get the keys to his girlfriend's car so that he could immediately pursue defendants. There is no evidence that he purposely, or inadvertently, delayed his actions. Instead, he immediately proceeded out of the house in pursuit of

the defendants. Webster's Ninth New Collegiate Dictionary defines immediate as "Occurring, acting, or accomplished without loss or interval of time." (Webster's New Collegiate Dict. (9th ed. 1991) p. 601.) Such definition adequately describes Mr. Cabral's actions.

Nonetheless, the dissent maintains that "defendants had momentarily won their way to a place of temporary safety."(Dis. opn., *post*, at p. 92.) We conclude otherwise. We reach such conclusion because the facts support a finding that Mr. Cabral was in immediate pursuit of defendants. In finding that defendants had reached a place of temporary safety, the dissent places too much weight on defendants' state of mind, i.e., they were "presumably looking for another car to burglarize." (*Id.* at p. 90.) However, defendants never testified as to their subjective beliefs. Even if they had, their belief is not dispositive on this issue. As we state in the next section, "[t]he black letter law announced in the relevant cases states the rule in terms of whether the defendant actually reached a place of temporary safety, rather than whether the defendant believed that he or she reached such a safe location. [Citations.]" (*People* v. *Johnson* (1992) 5 Cal.App.4th 552, 560 [7 Cal.Rptr.2d 23].)

■ While application of the felony-murder rule to this case may seem harsh, we are reminded of the rule's primary purpose, "to deter felons from killing negligently or accidentally by holding them strictly responsible for killings they commit." (*People* v. *Washington* (1965) 62 Cal.2d 777, 781 [44 Cal.Rptr. 442, 402 P.2d 130].)

*The Trial Court Properly Refused to Give Defendants' Pinpoint Instructions*

■ The jury was instructed on the law regarding felony murder and they were told that whether defendants had reached a place of temporary safety is an objective question of fact for them to decide based upon all the surrounding circumstances.[5] Defendants contend the trial court erred by refusing to give the following instructions on their request:

---

[5]"The unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs during the commission of burglary, a felony, is murder of the first degree when the perpetrator had the specific intent to commit such crime. [¶] The specific intent to commit burglary and the commission of such crime must be proved beyond a reasonable doubt." (CALJIC No. 8.21 (5th ed. 1988).)

"For the purposes of determining whether an unlawful killing has [occurred] during the commission [of burglary,] the commission of the crime of burglary is not confined to a fixed place or a limited period of time. [¶] A burglary is in progress after the original entry while the perpetrator is fleeing in an attempt to escape. Likewise it is still in progress so long as immediate pursuers are attempting to capture the perpetrator or to regain stolen property. [¶] A burglary is complete when the perpetrator has eluded any pursuers and reached a place of temporary safety." (CALJIC former No. 14.55, *supra.*)

Defense instruction No. 1 — "In determining whether a defendant has reached a 'place of temporary safety' you should consider the following factors: [¶] (1) the suspect's subjective belief as to whether he has reached a place of temporary safety; [¶] (2) whether the suspect had an opportunity to dispose of some or all of the loot from the crime; [¶] (3) any other facts relevant to determining whether the defendant has reached a 'place of temporary safety.' "

Defense instruction No. 2 — "A burglary is complete when the perpetrator has[,] even momentarily, reached a place of tempor[ar]y safety, and has disposed of the loot or is in unchallenged possession of the stolen property after having effected an escape with such property."

Defendants argue that these instructions would have informed the jury that they were allowed to consider defendants' subjective beliefs that they had reached a place of temporary safety and whether there was an opportunity to dispose of the stereo taken from the car. Respondent argues the instructions were properly rejected because the points defendants sought to convey were duplicative of, or adequately covered by, the given instructions. We agree with respondent. Where the proposed instructions are repetitious of others, or merely elaborate on the general instructions, the trial court may refuse to give them. (*People v. Sanders* (1995) 11 Cal.4th 475, 560 [46 Cal.Rptr.2d 751, 905 P.2d 420].) Furthermore, we note that neither defendant testified as to his subjective belief. This fact alone supports the trial court's decision to reject the requested instructions. Nonetheless, out of caution, we will complete our analysis of the trial court's decision.

Defense instruction No. 2 was adequately covered by CALJIC former No. 14.55, *supra*, (Burglary — When Still in Progress/Felony Murder) which informed the jury that a burglary was not complete until defendants had reached a place of temporary safety. Defense instruction No. 1 listed the factors which could be considered by the jury in deciding whether defendants had reached a place of temporary safety. However, whether defendants had reached a place of temporary safety is determined by an objective standard. (*People v. Johnson, supra*, 5 Cal.App.4th 552, 559-560.) "The black letter law announced in the relevant cases states the rule in terms of whether the defendant actually reached a place of temporary safety, rather than whether the defendant believed that he or she reached such a safe location. (See *People v. Milan* [(1973)] 9 Cal.3d [185,] 195 [107 Cal.Rptr. 68, 507 P.2d 956] [robbery incomplete until robber 'has won his way to a place of temporary safety']; *People v. Laursen* [(1972)] 8 Cal.3d [192,] 200, fn. 6 [104 Cal.Rptr. 425, 501 P.2d 1145] [robbery does not terminate 'until the robber reaches a location of temporary safety']; *People v. Salas* [(1972)]

7 Cal.3d [812,] 822 [103 Cal.Rptr. 431, 500 P.2d 7] [robbery was not complete 'as the robbers had not won their way to a "place of temporary safety" ']; *People* v. *Boss* [(1930)] 210 Cal. [245,] 250 [robbery incomplete until robbers have 'won their way even momentarily to a place of temporary safety']; see *People* v. *Fuller* [(1978) 86 Cal.App.3d 618,] 623 [150 Cal.Rptr. 515] [burglary continues during flight 'as long as the felon has not reached a "place of temporary safety." '].) . . .

"Certainly, appellate courts have considered the defendant's belief about whether he or she reached a place of temporary safety. (See, e.g., *People* v. *Kendrick* (1961) 56 Cal.2d 71, 90 . . . [defendant's belief that officer was about to arrest him for robbery, among other evidence, establishes that robbery was not yet complete].) However, this does not indicate that the defendant's state of mind is dispositive on this issue. Objective criteria have also been considered relevant to this issue . . . . (See *id.,* at pp. 76-78, 89-90 [time lapse, distance between felony and murder], *People* v. *Fuller*, *supra*, 86 Cal.App.3d at pp. 621-628 [homicide resulting from high-speed chase].)" (*People* v. *Johnson*, *supra*, 5 Cal.App.4th 552, 560.)

Thus, the issue of defendants' belief that they had reached a place of temporary safety is only one factor for the jury to consider. Under the instructions given by the trial court, defendants were able to, and did, argue all the factors, including their belief, during closing argument. As such we find no error in the trial court's refusal to give the instructions requested by defendants.

### *The Trial Court's Special Instruction on Felony Murder Was a Correct Statement of Law*

During deliberations, Naly's jury sent a series of four notes to the court.[6] Counsel stipulated to a readback by the court reporter. The next day, the jury indicated that they had reached a verdict on the burglary count, but were unable to agree on the murder charge. The court reread four instructions that had been previously given to the jury, namely, CALJIC Nos. 3.00 (5th ed. 1988) (Principles Defined), 3.01 (5th ed. 1988) (Aiding and Abetting—Defined), 17.10 (1989 rev.) (Conviction of Lesser Included or Lesser Related Offense), and 17.40 (5th ed. 1988) (Individual Opinion Required—Duty to Deliberate). After reading CALJIC No. 17.10, the court interjected, "I have a feeling that perhaps that instruction is somewhat confusing to you, so let me explain it to you in this manner: In terms of the lesser offenses, you may not consider those unless and until you have unanimously agreed that

---

[6]Defendant Naly explains that the notes are not part of the record on appeal because they could not be found in the superior court file.

the defendant is not guilty of the charged crime in Count I, that being the murder count. [¶] And in order for you to find him not guilty of that, you must conclude unanimously that the burglary was complete. And if you conclude that the burglary was complete, then you can consider the lesser charges or, in the alternative, return a not guilty verdict."

The court then instructed the jury with its special instruction: "A burglary continues during flight as long as the perpetrators have not eluded any pursuers and reached a place of temporary safety. Whether a defendant has reached a place of temporary safety is a question of fact for you, the jury, to determine. The issue of whether the defendant believed that he had reached a place of temporary safety may be considered by the jury. [¶] But the standard to be applied to the underlying question, however, is an objective one; that is, whether the defendant has actually reached a place of temporary safety rather than whether the defendant believed that he had reached such a safe location."

On appeal, Naly complains that the trial court's special instruction, as read, is an incorrect statement of the law. We disagree. As respondent points out, the trial court's instruction parallels CALJIC former No. 14.55 and correctly states the objective standard of determining whether defendants had reached a place of temporary safety based upon all the surrounding circumstances. (*People* v. *Johnson, supra,* 5 Cal.App.4th 552, 559-560.)

### The Trial Court Properly Admitted Thongvilay's Hospital Statement to Officer Clark

■ Prior to trial, Thongvilay moved to exclude his various statements to the police claiming he had not been advised of his *Miranda*[7] rights before making the first two statements. Although he was advised of his *Miranda* rights before making the third statement, he argued the officer who questioned him engaged in an impermissible "softening-up process" before advising him of his rights. Further, Thongvilay argued that his third statement was coerced and, therefore, not the result of a voluntary waiver of his *Miranda* rights.

The trial court held a hearing on Thongvilay's *in limine* motion to suppress his statements wherein the various police officers testified regarding their respective questioning of defendant. The testimony showed that Officer Douglas arrived at the accident scene shortly after 1:14 a.m. Without drawing her weapon she asked Thongvilay if he knew what had happened.

---

[7]*Miranda* v. *Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974].

He said, "Yeah, me and my friend crashed and I want to see if he's all right." Thongvilay was placed in Officer Douglas's police car while she went to check on the car in the adjacent field. As she approached the car in the field, she saw Naly lying facedown on the driver's side of the car and a female inside the car.

Officer Douglas unsuccessfully tried to wake Naly up and determined that the female inside the car had no pulse. As the officer backed away from the car Naly jumped up and almost hit her. In response, Officer Douglas drew her weapon and told him to lie back down. When she asked Naly what had happened, he said that he and his friend crashed.

Within minutes, Officer Nhek arrived at the scene in response to Officer Douglas's call for other units and paramedics. Officer Nhek went back to Officer Douglas's patrol car when she asked him to secure or watch Thongvilay. As Officer Nhek adjusted the light in the patrol car, Thongvilay asked him if anyone was dead. Officer Nhek said that he thought the driver of the other car was dead. Thongvilay started crying. When Officer Nhek asked Thongvilay if he knew who was driving at the time of the accident, he said, "It was me. It was me that was driving."

Fifteen or twenty minutes after Officer Douglas contacted Naly, she returned to her patrol car and asked Thongvilay what had happened and if he was driving the car. Thongvilay told her that he and his friend tried to steal a car stereo, were chased by the burglary victim, ran a red light and hit the lady. He then asked, "Is she okay? My life's over; right? I'm going to jail for murder; right? She is dead; isn't she?"[8]

Thongvilay was then taken to the hospital. About 4:20 a.m., some three hours after his statements at the accident scene, Officer Clark came to ask him some questions. Thongvilay was not in handcuffs; however, Officer Clark told him that he was under arrest for auto burglary and vehicular manslaughter. Thongvilay was read his *Miranda* rights. Thongvilay said that he was waiving his *Miranda* rights and signed the *Miranda* waiver form before giving the statements which the trial court ruled admissible and which he now challenges.

On appeal, Thongvilay contends the trial court erred in admitting the third statement because it was the product, or "fruit" of the two earlier un*Mirandized* statements. We disagree.

"In *Oregon* v. *Elstad* (1985) 470 U.S. 298 . . . , the United States Supreme Court rejected the notion that a subsequent confession must necessarily be excluded because it followed an otherwise voluntary statement that

---

[8]It was not established whether or not Thongvilay was able to leave the accident scene, but he was not yet under arrest.

was given without *Miranda* warnings: 'It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether is it knowingly and voluntarily made.' (470 U.S. at p. 309 . . . .)" (*People* v. *Lewis* (1990) 50 Cal.3d 262, 275 [266 Cal.Rptr. 834, 786 P.2d 892].) Here, the evidence shows that Thongvilay's statements at the scene of the accident were not coerced and that he voluntarily waived his *Miranda* rights before talking to Officer Clark at the hospital four hours later.

Even if we were to assume that the trial court erred in admitting Thongvilay's statements at the hospital, we would find the error was harmless beyond a reasonable doubt. (*People* v. *Cahill* (1993) 5 Cal.4th 478, 531-541 [20 Cal.Rptr.2d 582, 853 P.2d 1037].) There was overwhelming independent evidence, including Thongvilay's fingerprints on Mr. Cabral's girlfriend's car window, which showed that Thongvilay and Naly burglarized the car and caused the accident which took the life of Ms. Jacobs while they were escaping the scene of the burglary.

*The Trial Court Did Not Err by Failing to Instruct the Jury*
*With CALJIC No. 2.01*

Thongvilay contends that the trial court erred by failing to give CALJIC No. 2.01, entitled "Sufficiency of Circumstantial Evidence—Generally." "That instruction concerns the proper consideration of circumstantial evidence. However, the obligation to give CALJIC No. 2.01 arises only in those cases where circumstantial evidence is ' "substantially relied on for proof of guilt." ' [Citations.] 'The reason for this rule is found in the danger of misleading and confusing the jury where the inculpatory evidence consists wholly or largely of direct evidence of the crime. [Citation.]' [Citation.]" (*People* v. *Wright* (1990) 52 Cal.3d 367, 405-406 [276 Cal.Rptr. 731, 802 P.2d 221].)

Thongvilay contends that the prosecution's case "turned on an inference from the circumstance[,] . . . i.e., whether the defendants had or had not reached a place of temporary safety." We disagree. Reviewing the record, it is apparent to us that the prosecution relied primarily on the direct evidence of Mr. Cabral's testimony and Thongvilay's own admissions. (*People* v. *Marquez* (1992) 1 Cal.4th 553, 577 [3 Cal.Rptr.2d 710, 822 P.2d

418]; *People* v. *Turner* (1990) 50 Cal.3d 668, 693 [268 Cal.Rptr. 706, 789 P.2d 887]; *People* v. *Shea* (1995) 39 Cal.App.4th 1257, 1270-1271 [46 Cal.Rptr.2d 388].) Accordingly, we find no error in the trial court's failure to give CALJIC No. 2.01. (*People* v. *Blankenship* (1959) 171 Cal.App.2d 66, 84-85 [340 P.2d 282].)

### The Trial Court Properly Denied Thongvilay's Motion to Reduce His Verdict

After the verdict in this case, Thongvilay moved for a reduction of his verdict, with consequent reduction of the punishment, alleging violation of the constitutional prohibition of cruel or unusual punishment. The trial court denied the motion, stating that section 3046 made Thongvilay eligible for parole in seven years. It further concluded that Thongvilay's punishment did not constitute cruel or unusual punishment. On appeal, Thongvilay argues that the trial court erred in refusing to grant his motion. Respondent disagrees, stating that "[a]lthough the trial court did misconstrue . . . section 3046 by erroneously concluding that it made Thongvilay eligible for parole in seven years . . . , it nevertheless properly denied Thongvilay's motion to modify the verdict because Thongvilay's sentence of 25-years-to-life was not constitutionally disproportionate." We agree with respondent.

" ' "No rule of decision is better or more firmly established by authority, nor one resting upon a sounder basis of reason and propriety, than that a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason. If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion." ' " (*People* v. *Zapien* (1993) 4 Cal.4th 929, 976 [17 Cal.Rptr.2d 122, 846 P.2d 704].) Here, we need not consider the trial court's understanding regarding section 3046 in deciding to deny Thongvilay's motion. Instead, we find that the motion was properly denied because Thongvilay's 25-year-to-life term was authorized by law and does not constitute cruel or unusual punishment.

In his final argument, Thongvilay contends that his sentence constitutes cruel and unusual punishment under the United States and California Constitutions because the penalty is grossly disproportionate to the offense for which it is imposed. (*People* v. *Dillon* (1983) 34 Cal.3d 441, 478 [194 Cal.Rptr. 390, 668 P.2d 697]; and *In re Lynch* (1972) 8 Cal.3d 410, 424 [105 Cal.Rptr. 217, 503 P.2d 921].)

A sentence may violate the state constitutional ban on cruel and unusual punishment (Cal. Const., art. I, § 17) if " ' . . . it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and

offends fundamental notions of human dignity.' " (*People* v. *Dillon, supra,* 34 Cal.3d 441, 478, quoting *In re Lynch, supra,* 8 Cal.3d 410, 424.)

In order to determine whether a particular punishment is disproportionate to the offense for which it is imposed, we conduct a three-pronged analysis. (*People* v. *Dillon, supra,* 34 Cal.3d 441, 479; *In re Lynch, supra,* 8 Cal.3d 410, 429-438.) First, we examine the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society. A look at the nature of the offense includes a look at the totality of the circumstances, including motive, the way the crime was committed, the extent of the defendant's involvement, and the consequences of defendant's acts. A look at the nature of the offender includes an inquiry into whether "the punishment is grossly disproportionate to the defendant's individual culpability as shown by such factors as his age, prior criminality, personal characteristics, and state of mind." (*People* v. *Dillon, supra,* 34 Cal.3d 441, 479.) Next, we compare the challenged punishment with the punishment prescribed for more serious crimes in the same jurisdiction. And finally, the challenged punishment is compared with punishment for the same offense in other jurisdictions.

This three-pronged analysis provides guidelines for determining whether a punishment is cruel or unusual. The importance of each prong depends on the facts of each case. An examination of the first prong alone can result in a finding of cruel or unusual punishment. (*People* v. *Dillon, supra,* 34 Cal.3d 441, 479, 482-483; *People* v. *Young* (1992) 11 Cal.App.4th 1299, 1308-1311 [15 Cal.Rptr.2d 30].) Regarding the other prongs, defendant bears the burden of proof. (*In re DeBeque* (1989) 212 Cal.App.3d 241, 254-255 [260 Cal.Rptr. 441].) ·

 Turning to the instant case, Thongvilay was convicted of two burglaries and first degree felony murder. Focusing his argument solely on the first prong of the analysis, he argues that he was "immature, being only a few days past his 17th birthday," he had no prior record of convictions, and the "case was a fairly minor automobile burglary, which turned into a car chase when the victim took off after the perpetrators, and finally into a homicide when the perpetrators, fearing the harm the enraged burglary victim might do to them, ran a red light at exactly the wrong time." Moreover, he claims that the circumstances surrounding the commission of the offense underscore its nonviolent nature and the inadvertence of the tragic accident which resulted.

Nonetheless, we note that according to the probation report, Thongvilay's earlier auto burglary also involved an accident while he was fleeing the

scene. At the time of the current offense, he was driving despite the fact that his driving privileges had been suspended for negligence. When considering his prior auto burglary, we find that Thongvilay knew the danger he was getting into when he committed the second auto burglary, which resulted in the death of Ms. Jacobs. After analyzing the first prong, we are unable to conclude that Thongvilay's sentence constitutes cruel and unusual punishment.

Furthermore, we agree with respondent that Thongvilay's sentence does not shock the conscience or offend fundamental notions of human dignity. (See *People* v. *Guinn* (1994) 28 Cal.App.4th 1130, 1145-1147 [33 Cal.Rptr.2d 791] [upholding a life without possibility of parole term for 17-year-old convicted of robbery murder]; *People* v. *Weddle* (1991) 1 Cal.App.4th 1190, 1199-1200 [2 Cal.Rptr.2d 714] [upholding a 25-year-to-life term for a commercial burglar who killed his victim in a traffic accident while fleeing the scene of the burglary]; *People* v. *Hankey* (1989) 215 Cal.App.3d 510 [263 Cal.Rptr. 615], [upholding 25-year-to-life term for nonshooter convicted of robbery murder despite his youth, his lack of prior convictions and the possibility he did not intend to kill]; *People* v. *Harpool* (1984) 155 Cal.App.3d 877 [202 Cal.Rptr. 467] [upholding 25-year-to-life term of a youth convicted of robbery murder despite his young age and no felony priors].)

Finally Thongvilay claims that the same analysis argued under the California Constitution applies to his claim under the United States Constitution. Thus, he maintains that his sentence should be reversed under the Eighth Amendment as well as the California Constitution. For the reasons stated above, we disagree.

### DISPOSITION

The judgments are affirmed. The trial court is ordered to prepare an amended abstract of judgment to reflect the fact that Naly was sentenced for second degree murder.

Richli, J., concurred.

**McKINSTER, J.**—I reluctantly agree with the majority's conclusion, citing *People* v. *Fuller* (1978) 86 Cal.App.3d 618 [150 Cal.Rptr. 515] and *People* v. *Bodely* (1995) 32 Cal.App.4th 311 [38 Cal.Rptr.2d 72], that a killing that occurs during the course of a burglary of a car supports first degree

felony-murder liability.[1] I respectfully dissent, however, from the majority's conclusion that the evidence presented in the trial court is sufficient to support the jury's finding that the death in this case occurred during the commission of the car burglary. In my view, the evidence presented in the trial court is insufficient to support the jury's first-degree felony-murder conviction because, unlike *Bodely* or *Fuller*,[2] defendants here were not immediately pursued from the car burglary. Therefore, the death in this case did not occur during the defendants' *immediate* flight from the scene of that crime and before defendants reached a place of temporary safety. In other words, I would conclude as a matter of law that the death and the burglary were not part of *one continuous transaction* in this case.

According to the undisputed evidence presented in the trial court, defendants drove away after stealing the stereo and were not immediately pursued. Defendants drove slowly through the housing development for some minutes, presumably looking for another car to burglarize, before Charles Cabral began his search for defendants' red car. During that time, defendants examined and discarded the stolen stereo. Several minutes more elapsed before defendants actually encountered Cabral.[3] It was only then that defendants "fled." Thus, defendants were not engaged in flight from the burglary but, rather, were fleeing from their later and separate encounter with the crime victim, when the death occurred in this case. The burglary was complete because defendants, as a matter of law, had reached a "place of temporary safety" when they returned to their car with the stolen stereo and

---

[1]Interestingly, the *Fuller* court devoted more than half of its discussion of the above noted issue to apologizing for its decision to extend first degree felony murder to the accidental killing at issue in that case. (*People* v. *Fuller, supra*, 86 Cal.App.3d at pp. 624-628.) When the Legislature enacted the felony-murder statute in 1872 only nighttime residential burglaries were criminalized in Penal Code section 459. Later, the Legislature divided burglary into degrees (Pen. Code, § 460) and added automobile burglaries as second degree burglaries without amending the first degree felony-murder statute (Pen. Code, § 189) to include only first degree burglaries. It is questionable whether the Legislature really intended a car burglary to be included with the other inherently dangerous crimes that trigger the first degree felony-murder rule. (*People* v. *Fuller, supra*, at p. 627.) The burglary of an unattended car by an unarmed perpetrater is not inherently dangerous to human life. It would be insufficient to even support second degree felony murder. "[H]ow can it rationally be used to support a first degree felony murder?" (*Id.* at p. 626.)

[2]The facts in *Fuller*, in which the Fifth District reversed an order granting the defendant's Penal Code section 995 motion and dismissed a first degree felony-murder charge, are that a police officer saw the defendants stealing tires from a closed car lot. When the defendants got into their car and "drove away 'really fast' " the officer followed and "a high speed chase ensued." That chase ended when the defendants ran a red light at an intersection and hit a car, killing the driver. (*People* v. *Fuller, supra*, 86 Cal.App.3d at pp. 621-622.)

[3]The majority note defendants turned off the headlights on their car at that point. In my view, that fact cuts the opposite way and supports my conclusion that defendants were not immediately pursued, as disclosed by the fact they were driving around the neighborhood with the headlights on, presumably looking for another car to burglarize.

drove away without being pursued. Defendants, therefore, no longer were engaged in the commission of the burglary when they crashed into Joann Jacobs's car. That a period of only minutes separated the burglary from Cabral's search for defendants emphasizes the temporary nature of defendants' safety but does not negate the fact that defendants actually reached such a place and therefore no longer were engaged in the burglary at the time of the collision.

Because felony murder is a legal fiction that "ascribes malice aforethought to the felon who kills in the perpetration of an inherently dangerous felony" (*People* v. *Washington* (1965) 62 Cal.2d 777, 780 [44 Cal.Rptr. 442, 402 P.2d 130]) it "erodes the relation between criminal liability and moral culpability." (*Id.* at p. 783.) Where, as in this case, the underlying felony is the burglary of an unattended automobile, a crime which is not inherently dangerous to human life, I would require strict compliance with the essential factual elements of the so-called escape rule. Therefore, I would interpret the phrase "immediate pursuit" literally to require proof of actual physical pursuit without any intervening delay. That did not occur in this case. By the majority's own account of the facts, Cabral did not immediately pursue defendants. Instead, he went inside the house, called the police and then got his car keys from the nightstand in the bedroom.

During the interval of time Cabral was in the house, defendants drove away. Cabral was not pursuing them when defendants left the crime scene and that lapse in time precludes Cabral's pursuit from being "immediate." That Cabral could not immediately pursue defendants because he apparently did not have the keys to his car does not excuse the requirement that the pursuit be "immediate." Thus, defendants were not fleeing the crime scene, or escaping from immediate pursuers when they crashed into and killed Ms. Jacobs.

I base my conclusion defendants had reached a place of temporary safety, in part, on *People* v. *Salas* (1972) 7 Cal.3d 812 [103 Cal.Rptr. 431, 500 P.2d 7, 58 A.L.R.3d 832], in which the Supreme Court explained the "escape rule" and in doing so, noted, "The phrases 'place of temporary safety' and 'scrambling possession' are derived from the landmark case of *People* v. *Boss* (1930) 210 Cal. 245 . . . . In that case two defendants robbed a store and ran into the street; an employee immediately pursued them and was shot by Boss a moment later when the furthermost defendant was no more than 125 feet from the store. We [the Supreme Court] held that the trial court properly instructed the jury as to first degree felony murder as the homicide was committed in the perpetration of a robbery and we stated: 'It is a sound principle of law which inheres in common reason that where two or more

persons engage in a conspiracy to commit robbery and an officer or citizen is murdered while in immediate pursuit of one of their number who is fleeing from the scene of the crime with the fruits thereof in his possession, or in the possession of a co-conspirator, the crime is not complete in the purview of the law, inasmuch as said conspirators have not won their way *even momentarily* to a place of temporary safety and the possession of the plunder is nothing more than scrambling possession." (*People* v. *Salas, supra,* 7 Cal.3d at pp. 821-822, italics added.) Although the *Salas* court acknowledged that "[t]he meaning of the two phrases is not made entirely clear" it nevertheless concluded, "The fact that a robber has not won his way to a 'place of temporary safety' can only mean that he is still fleeing, still trying to escape." (*Ibid.*)

Defendants in this case did not "flee" the burglary; they simply left the crime scene.[4] Likewise, there was no immediate pursuit of defendants. In fact, during the time he was on the telephone talking to the police, Cabral did not actually know where defendants were, although he had a hunch about their location. Defendants were not "still fleeing" or "still trying to escape" with the fruit of the burglary in their possession at the time of the automobile collision—defendants were fleeing from their later, and separate, encounter with Cabral. In returning to their car and driving away without immediately being pursued, defendants had momentarily won their way to a place of temporary safety.

The collision in this case unquestionably was related to the burglary in the sense that Cabral would not have gone out to look for defendants had he not first seen them steal the stereo from the car. Nor, presumably, would defendants have fled had they not recognized Cabral's car as one they recently burglarized. First degree felony murder requires proof of more than a relationship between the burglary and the collision. It requires proof the killing occurred during the commission of the burglary before liability equivalent to that of premeditated murder may be extended to an accidental killing.

By disagreeing with the majority, I do not intend to suggest that defendant Thongvilay, who was the driver of the car, is not criminally responsible for the death of Ms. Jacobs. As to him, the evidence might support a second degree murder conviction on an implied malice theory and clearly supports a

---

[4]The majority focus on the fact defendants left the car door open when they left the scene of the crime. In the majority's view, this fact is only explicable as evidence that defendants were fleeing the scene. In my view the fact defendants left the car door open is irrelevant. Defendants were burglars, after all, who had just broken into the car and ripped out the stereo. Ordinarily burglars are not so courteous as to tidy up when they leave, the majority's apparent contrary view notwithstanding.

vehicular manslaughter charge. The People, however, chose to prosecute this case only on a first-degree felony-murder theory, presumably because that was the only homicide theory that would also include the passenger, defendant Done Naly. Because he had no control over the car in which he was riding as a passenger, to hold defendant Naly responsible for first-degree felony-murder based on his participation in a felony that is not inherently dangerous is a manifest injustice.

I, therefore, respectfully disagree with the majority and would reverse the judgments. Because I would reverse the judgments, I do not address the remaining issues defendants raise in this appeal and therefore express no view regarding the majority's resolution of those issues.

A petition for a rehearing was denied March 25, 1998, and appellants' petition for review by the Supreme Court was denied June 17, 1998. Mosk, J., was of the opinion that the petition should be granted.